**Anthony PERRI a/k/a Anthony Marino Plaintiff,**

v.

**The UNITED STATES, Defendant,**

**No. 95–359 C.**

United States Court of Federal Claims.

Aug. 27, 2002.

Irwin Popkin, Shirley, New York, attorney of record for plaintiff.

Virginia G. Farrier, Washington, D.C., with whom was Assistant Attorney General Robert D. McCallum, Jr., for defendant.

## OPINION

LYDON, Senior Judge.

Plaintiff, a former confidential informant and cooperative witness for the Federal Bureau of Investigation, alleges that he had a contract with the United States in which the Government promised to pay him one quarter of the proceeds generated by the sale of a horse farm in New York State previously owned by a reputed member of a Mafia crime family that had been forfeited to the United States in a criminal proceeding following an undercover F.B.I. sting operation. Plaintiff also asserts a contractual right to one quarter of the value of all other properties or money forfeited to the Government in the sting operation. Defendant denies that the United States entered into any contractual relationship with the plaintiff or otherwise owes any money to the plaintiff. The case is before the court on defendant's motion for summary judgment, plaintiff's opposition thereto, and plaintiff's motion to compel the production of certain documentation and information by defendant. For the reasons discussed hereinafter, the court denies plaintiff's motion to compel and grants defendant's motion for summary judgment.

### FACTUAL AND PROCEDURAL BACKGROUND

#### I.

In December 1989 the plaintiff, Anthony Perri (a/k/a Anthony Marino), walked into the Las Vegas, Nevada, field office of the Federal Bureau of Investigation ("FBI") offering information about certain individuals in a New York "crime family" and their

purported illegal activities in the Las Vegas area. On January 8, 1990, FBI Special Agent William R. Matthews sent a memorandum to the Special Agent in Charge ("SAC") of the Las Vegas field office stating that plaintiff had provided information on various organized crime figures in Las Vegas and New York and requesting that plaintiff be paid $200.00 for his services. Matthews' superior, Supervisory Special Agent ("SSA") George Togliatti, supported the request by writing "I concur with above payment" on the bottom of the memorandum and signing his name. The SAC approved the payment to Perri.

Thereafter, the Las Vegas field office commenced a preliminary investigation into the crime family's illicit activities (*i.e.,* money-laundering) in the Las Vegas, Nevada, area. The investigation remained preliminary pending the approval by FBI headquarters of (1) a proposed undercover operation, designated a "Group I Undercover Operation," and (2) a formal budget. In the context of the preliminary undercover operation Perri, with the approval of the SAC in Las Vegas, was classified as a "confidential informant." Based on this classification the FBI could, in its sole discretion and with the expressed approval of the SAC, make limited monetary payments to Perri for his "services" as a confidential informant and reimburse him for any "expenses" incurred in the furtherance of the undercover operation.

After the initial $200.00 payment from the FBI, approved on January 8, 1990, Perri received a series of additional payments over the next several months for his continued assistance in the preliminary investigation. Each payment followed the same procedure. Special Agent Matthews would make itemized requests, usually supported with the SSA's standard "I concur" language and signature, which were then approved by the SAC in Las Vegas. On January 11, 1990, for example, Matthews requested that Perri be paid $200.00 for "making consentually monitored telephone calls" to certain subjects of the investigation, "providing detailed information" germane to the investigation, and "positioning himself .... in anticipation of" the undercover operation. Perri was paid the same day.

Further payments followed. On January 19, 1990, pursuant to Special Agent Matthews' memorandum request of January 17, Perri was paid $500.00 "for services provided during the period of 1/12/90—1/17/90." Those services included information helpful in "setting up" the undercover operation and establishing contacts with targets of the FBI investigation. On January 21, 1990, pursuant to Special Agent Matthews' memorandum request of January 11, Perri received an advance payment of $144.50 to cover the estimated cost of renting a room for a week of meetings and debriefings. On January 26, 1990, pursuant to Special Agent Matthews' memorandum request of January 23, Perri received a payment of $445.00 for expenses incurred in a trip connected with the FBI investigation. On January 31, 1990, pursuant to Special Agent Matthews' memorandum request of January 29, Perri was reimbursed $390.00 for the expenses he allegedly incurred (including a gambling debt and a week's apartment rent) in meeting with the targets of the investigation. Similar payments ensued during the next three months (totaling $1,028.00 in February, $936.50 in March, and $438.50 in April 1990) for additional "services" performed by Perri in furtherance of the FBI preliminary investigation. Two additional payments (of $150.00 and $450.00) on May 4, 1990 brought the aggregate amount paid to Perri for "services" and "expenses" under the authority and approval of the FBI's Special Agent in Charge, Las Vegas, to $4,288.50.

Meanwhile, on May 3, 1990, FBI Headquarters, through its Criminal Undercover Operations Review Committee ("Undercover Review Committee"), approved the proposal submitted by the Las Vegas field office for "Group I Undercover Operation" status for six months in furtherance of the money-laundering investigation. The budget approved by FBI Headquarters included discretionary authority, to be exercised by the Special Agent in Charge, to make monthly payments to Perri of $2,000.00 for his services and to reimburse Perri for expenses he incurred in connection with the operation. In the follow-

ing months Perri received a series of payments from the FBI which, like those during the preliminary investigation, were made in accordance with a memorandum request by Special Agent Matthews and approval thereof by the SAC, Las Vegas. The first payment to Perri in the undercover operation, made on August 16, 1990, was in the amount of $3,000.00 for services provided during the six-week time period May 3—June 14, 1990. A second payment of $3,000.00 was made on September 4 for services provided from June 15 to July 31, 1990. A third payment of $1,500.00 was made on October 4 for rental vehicle expenses incurred by Perri during the four-month time period May 3—September 3, 1990. On October 20, 1990, Perri received a payment in the amount of $2,000.00 for "services" performed during the month of August.

The undercover operation was extended for six-months on October 23, 1990. As before, the budget approved by FBI Headquarters authorized the SAC to pay Perri for his ongoing services at the rate of $2,000.00 per month, acting on the memorandum requests of Special Agent Matthews. Beginning in November 1990 the FBI added $375.00 for automobile expenses to its monthly checks to Perri (rather than paying Perri separately for automobile expenses). The first such check for $2,375.00 (paying Perri for his "services" and automobile expenses during the month of September) went out on November 19, 1990. Thereafter Perri continued to receive payments in that amount on a monthly basis.

The undercover operation received a second six-month extension on April 26, 1991, a third six-month extension on October 28, 1991, and was amended on February 9, 1992. Aside from his ongoing monthly payments of $2,375.00, Perri occasionally received additional payments for expenses he incurred in connection with the undercover operation. These included a payment of $860.00 on June 27, 1991 for travel expenses, $1,000.00 on August 23, 1991 and $780.00 on February 14, 1992 for evidence-gathering expenses, as well as $1,492.00 on April 16, 1992, for travel expenses. Like the FBI's regular monthly payments to Perri, these additional payments

were approved by the SAC pursuant to memorandum requests of Special Agent Matthews.

On May 14, 1992, the undercover operation was approved for a fourth and final six-month extension. As with the earlier extensions, the budget set aside discretionary funds with which to compensate Perri for his "services" and "expenses." Just as before, payments were approved by the SAC after a memorandum request from Special Agent Matthews (who was replaced in the undercover operation during the summer of 1992 by Special Agent Christopher J. Byers). During the fourth extension of the undercover operation Perri received a payment for "services" of $3,000.00 on June 1, 1992, following by three more payments of $2,375.00 (aggregating $2,000.00 for "services" and $375.00 for "expenses") on June 29, 1992, July 27, 1992, and August 28, 1992. In addition, Perri was paid $285.00 on August 15, 1992 for certain other "expenses" he incurred.

On August 21, 1992, a criminal indictment was filed against four Mafia individuals on money laundering and conspiracy charges. This brought the undercover aspect of the FBI Group I Undercover Operation to a conclusion. At that point Anthony Perri's status as a "confidential informant" was changed to that of a "cooperating witness." Perri entered the Federal Witness Security Program, under the care of the U.S. Marshals Service, on September 15, 1992.

In a memorandum to the SAC in Las Vegas, dated September 30, 1992, Special Agent Byers requested that Perri be paid an additional $1,000.00 for "services" performed during the time frame August 27—September 30, 1992. The memorandum mentioned that four crime family members had been indicted in August and that a horse farm had also been seized as part of the indictment. Byers indicated in his memorandum that sufficient funds remained in the undercover operation budget to cover the request, and added: "It is anticipated that this will be the last payment to [Perri]."

In a follow-up letter from the SAC, Randolph Prillaman (by SSA George Togliatti), to the Deputy U.S. Marshal in San Jose,

California, dated October 5, 1992, the FBI declared that "Mr. Perri's assistance was invaluable in an investigation that to-date has resulted in four indictments and the seizure of real estate valued at eleven million dollars." The letter requested the Deputy Marshal's assistance in expediting the processing of the $1,000.00 cashier's check to Perri (since Perri was now in the Witness Protection Program and therefore under the care of the U.S. Marshals Service) and also stated that "[n]o further payments are anticipated until the completion of all criminal and forfeiture proceedings." The request with respect to the cashier's check was approved by the SAC and Perri was paid the $1,000.00 on October 26, 1992.

Around the time Perri entered the Witness Security Program (September 1992) he completed a "Memorandum of Understanding" with the FBI. The document included an entry which read:

> 3. The witness and/or authorized dependant(s) state that the following promises or agreements have been made to the witness by government agents or government attorneys: (The witness and authorized dependant(s) should enter all promises or agreements not expressly prescribed in the Memorandum of Understanding, or enter "NONE")

In response thereto, Perri wrote the following:

> Agent Matthews had told me that at [the] end of things I would be given a lump sum of money based on how much they gave me while I was helping them.

In January 1993 the FBI initiated an internal investigation of Perri's MoU allegation to determine what, if any, promises were made to him by Special Agent Matthews (or any other FBI agent). The investigation culminated in a brief report on February 9, 1993, from the Las Vegas field office (Special Agent Byers was identified as the "point of contract"), to the FBI Criminal Informant Unit in Chicago. The report, which was based on a review of Perri's "confidential informant" and "cooperative witness" files as well as "the personal knowledge of the Las Vegas Division," recounted Perri's relationship with the FBI as follows:

> .... while PERRI was operated as a CI [confidential informant] and CW [cooperative witness] in Las Vegas, he received a monthly salary for services and expenses. Additionally, PERRI received money for other expenses not included in the monthly payment. Following PERRI's entry into the WSP [Witness Security Program] one final payment was forwarded through the U.S. MARSHAL's SERVICE to PERRI..... No services contract was executed with PERRI and no information regarding any promises to PERRI was obtained.

In mid-August 1993 Perri unilaterally left the Federal Witness Security Program. In a memorandum to the SAC, Las Vegas, on August 23, 1993, Special Agent Byers indicated that Perri's action was prompted by a series of disagreements with the U.S. Marshal's Service. Byers requested the SAC's authorization to pay Perri $2,000.00 to secure his safety and cover his expenses until government officials could get him reinstated in the program. The requested amount included $425.00 for airfare to a secure location, $900.00 for food, and $675.00 for lodging.

With the above request still pending, Perri decided that he would rather be relocated instead of returning to the Witness Security Program. Accordingly, Special Agent Byers sent another memorandum to the SAC, Las Vegas, dated September 3, 1993, requesting authorization to pay $2,000.00 to Perri "for the purpose of relocation .... in lieu of reinstatement into the Witness Security Program." The requested amount was to cover the costs of airfare ($400.00), lodging ($600.00), and entertainment ($1,000.00). Byers stated further in the memorandum that:

> [Perri] has agreed that this will be a one-time payment and will request no further assistance from the Government. This will result in a significant savings to the Government.

Earlier in the memorandum Byers had estimated that it would cost the Government over $40,000.00 to reinstate and maintain Perri in the Witness Security Program until the trial of the indicted Mafia individuals

scheduled for February 1994. Perri was paid the $2,000.00 by the FBI on September 9, 1993, and proceeded to relocate.

A subsequent letter from the SAC, Randolph Prillaman (by SSA George Togliatti), to the Department of Justice's Organized Crime Strike Force ("OCSF") in Las Vegas, dated October 19, 1993, memorialized recent conversations between Special Agent Byers and OCSF personnel concerning the additional payment to Perri. The letter confirmed that the OCSF concurred with the FBI's $2,000.00 payment to cover Perri's relocation expenses. The letter also restated that "[t]hese payments [actually just one payment] would represent the final assistance provided to Mr. Perri."

Thus, from January 1990 to September 1993 Perri received payments from the FBI for "services" and "expenses" in furtherance of the Group I Undercover Operation totaling $80,911.50.

The Government's case against the four indicted crime family members never went to trial. Instead, the defendants plea bargained with the Government. As part of the plea bargain agreement the horse farm that was owned by one of the accused and seized by the Government at the time of the indictment—a 97–acre property on Long Island called "Old Westbury Farm"—was forfeited to the United States. Other property was forfeited as well. (See note 4, *infra.*) The horse farm was subsequently sold at auction.

## II.

On May 24, 1995, Perri filed suit in this court seeking to recover $1.4 million from the United States. This amount represented one quarter of the proceeds resulting from the Government's auction of Old Westbury Farm, which plaintiff indicated was sold at a price of $5.6 million.[1] According to Perri, Special Agent Matthews had promised that in exchange for his assistance in producing the evidence necessary for a criminal indictment, the Government would pay him an award equal to one quarter of the property's auction price. Plaintiff claimed that he was entitled to this compensation under 28 U.S.C. § 524.[2] In addition to his statutory claim, plaintiff alleged that his dealings with Special Agent Matthews created a binding contract with the United States which was breached when the Government failed to pay Perri $1.4 million after the sale of the horse farm. On September 14, 1995, prior to any response by the Government, plaintiff filed his first amended complaint attempting, among other things, to clarify the jurisdictional basis of his action.

On September 25, 1995, defendant filed a motion to dismiss plaintiff's claim. While acknowledging that the Tucker Act grants this court jurisdiction of claims founded, *inter alia,* upon "any Act of Congress . . . . or upon any express or implied contract with the United States," 28 U.S.C. § 1491(a), defendant argued that (1) Perri did not have either an express or an implied-in-fact contract with the United States because Special Agent Matthews did not have contracting authority within the FBI and (2) the payment provisions in 28 U.S.C. § 524 are discretionary, not mandatory, and therefore do not confer upon Perri any substantive right to compensation. Hence, plaintiff was not entitled to any relief in this action.

After briefing and oral argument, the court issued an opinion on May 29, 1996, *Perri v. United States,* 35 Fed.Cl. 627 (1996). The court dismissed plaintiff's claim insofar as it was based on 28 U.S.C. § 524(c), ruling that

---

1. At oral argument (July 29, 2002) plaintiff's counsel said he read this figure in a newspaper article about the sale of the horse farm. Transcript at 15. The $5.6 million figure is not contested by the Government in this case.

2. This statute established the "Justice Assets Forfeiture Fund." 28 U.S.C. § 524(c)(1). It granted the Attorney General discretionary authority to pay "awards for information or assistance directly relating to violations of the criminal drug laws of the United States or of sections 1956 and 1957 of title 18, sections 5313 and 5324 of title 31, and section 60501 of the Internal Revenue Code of 1986," 28 U.S.C. § 524(c)(1)(B), as well as "awards for information or assistance leading to a civil or criminal forfeiture involving any Federal agency participating in the [Justice Assets Forfeiture] Fund," 28 U.S.C. § 524(c)(1)(C). The statute also specified that "[a]ny award for information pursuant to paragraph (1)(C) shall not exceed the lesser of $250,000 or one-fourth of the amount realized by the United States from the property forfeited." 28 U.S.C. § 524(c)(2).

the statute did not mandate the payment of any money by the Attorney General to informants and therefore could not be interpreted as waiving the sovereign immunity of the United States with the intention of creating a substantive right to compensation. 35 Fed. Cl. at 632. See also *Eastport Steamship Corporation v. United States*, 178 Ct.Cl. 599, 605–607, 372 F.2d 1002 (1967); *United States v. Testan*, 424 U.S. 392, 397–98, 96 S.Ct. 948, 47 L.Ed.2d 114 (1976). But the court withheld any dispositive ruling on the breach of contract theory, ordering instead that plaintiff take discovery on the issue of contracting authority and that both parties brief the issue thereafter. 35 Fed.Cl. at 633. This the parties did during the latter half of 1996.

On March 4, 1997, following an off-the-record conference call the day before, the court issued an order suspending further consideration of defendant's motion to dismiss and directing defendant to file a motion for summary judgment. Defendant filed its motion for summary judgment on May 28, 1997. Plaintiff filed an opposition thereto on June 11, 1997, and defendant filed a reply on July 7, 1997.

In its motion for summary judgment, the Government argued that no contract came into being between Perri and the FBI because the Special Agents who allegedly made promises of compensation to Perri did not possess the requisite authority to bind the FBI to make payments to confidential informants or cooperative witnesses. Nor did the doctrine of implied actual authority, first articulated in *H. Landau & Co. v. United States*, 886 F.2d 322 (Fed.Cir.1989) ("Authority to bind the [G]overnment is generally implied when such authority is considered to be an integral part of the duties assigned to a[G]overnment employee." *Id.* at 324), apply in this case because there was no evidence that executing or administering contracts with confidential informants or cooperative witnesses was an "integral part" of the duties assigned to the FBI personnel with whom Perri had direct contact (Special Agent Matthews and, later, Special Agent Byers). Nor did the FBI Manual include special agents among those in the chain of command who

are specifically authorized to commit government funds.

Plaintiff, in its opposition to defendant's motion for summary judgment, argued that Special Agent Matthews did have implied actual authority to bind the FBI in contract, so that his alleged promise that Perri would receive one quarter of the proceeds of the auction of Old Westbury Farm, as a reward for his assistance in the undercover operation, was a contractual commitment breached by the Government when it failed to pay Perri his share of the $5.6 million sale price. Plaintiff also argued that he was entitled to compensation on the basis of "quantum meruit," citing a number of cases in this court and the Federal Circuit that found plaintiff was entitled to relief under an implied-in-fact contract if the Government received a benefit from plaintiff pursuant to an illegal or unenforceable contract without paying therefor. Lastly, plaintiff argued that an implied-in-fact contract came into being because higher ranking officials at the FBI ratified the promise made by Special Agent Matthews to compensate Perri with proceeds from the horse farm sale, citing the October 5, 1992 letter from the SAC, Las Vegas, discussed *supra*, advising the Deputy U.S. Marshal in San Jose that "Mr. Perri's assistance was invaluable in the investigation . . . ." and that "[n]o further payments are anticipated *until the completion of all criminal and forfeiture proceedings*." (Emphasis added.) Plaintiff also cited *Silverman v. United States*, 230 Ct.Cl. 701, 679 F.2d 865 (1982), in which the Court of Claims ruled that knowing acceptance of benefits by an official empowered to bind the government can result in ratification of the promise of an unauthorized official. *Id.* at 870.

In its reply brief, defendant reiterated its contention that the doctrine of implied actual authority was inapplicable and rejected plaintiff's argument that the FBI ratified any promise by Special Agent Matthews to Perri. In addition, defendant argued that plaintiff's quantum meruit claim was based on the equitable damages theory of unjust enrichment— or "contract implied-in-law"—over which this court lacks jurisdiction, citing *Trauma Ser-*

*vice Group, Ltd. v. United States,* 33 Fed.Cl. 426, 432 (1995).

After completion of the parties' briefing on defendant's motion for summary judgment the Federal Circuit, in January 1998, issued an opinion in *Janowsky v. United States,* 133 F.3d 888 (Fed.Cir.1998), which confirmed, along the lines of *Silverman,* that institutional ratification of an unauthorized contract can overcome the lack of contracting authority on the part of the government official(s) who made it. *Janowsky* also involved an FBI sting operation, like the case at bar, and the issue of promises made by the special agent in charge that were disavowed by FBI Headquarters. The Federal Circuit, in vacating a Court of Federal Claims judgment dismissing the claim and remanding the case to that court for further proceedings, indicated that an implied-in-fact contract could have come into being if the FBI ratified a proposed, but unapproved, contract with the Janowskys by allowing the sting operation to proceed and accepting the benefits of the unapproved agreement. *Id.* at 891–92.[3]

In the wake of *Janowsky* and an off-the-record conference call focusing on the issue of contract ratification, plaintiff filed a second amended complaint on March 31, 1998, in which he added the implied actual authority, ratification, and *quantum meruit* theories of contract recovery discussed in his opposition to defendant's motion for summary judgment, but not formally included in his original or first amended complaint. Plaintiff emphasized in particular the theory of contract ratification, alleging that Special Agent Matthews met with his superiors at FBI Headquarters in Washington, D.C. and received their approval to proceed with the sting operation and seize Old Westbury Farm. According to the plaintiff, Matthews informed him that "Washington" had advanced $250,000.00 to "seed the case" until the horse farm was seized, after which "serious" money would be available to pay Perri. (Second Amend. Compl. at 4.) "Upon information and belief," plaintiff alleged, "the plan to seize the farm was specifically approved by high-ranking officials in the FBI and/or the United States government who had actual authority to contract on behalf of the United States." *Id.* at 4–5. "By reason of the foregoing," plaintiff continued, "the United States adopted and ratified the agreements, promises and understandings between [Perri] and Matthews." *Id.* at 8. In his second amended complaint Perri also upped the amount of his claim, asserting that Special Agent Matthews told him that Old Westbury Farm was worth $14–16 million and expressly promised him between $3.5 million and $5 million from its forfeiture and sale. In addition, plaintiff asserted that he was promised one quarter of the value of all other property forfeited to the Government as a result of the money laundering scheme.[4]

With the court's blessing, the parties commenced discovery on the issue of contract ratification. Plaintiff began by serving defendant (1) deposition notices of FBI Special Agents Matthews and Byers and (2) a first request for the production of all documents and audio tapes held by the FBI and other federal offices relating to (a) the criminal arrests, indictments and convictions resulting from the sting operation, (b) the property

---

**3.** The FBI sting operation involving Janowsky, conducted during the 1980s, generated extensive litigation over the years as Janowsky sought monetary relief from the United States on breach of contract, quasi-contract, and Fifth Amendment taking theories. A number of the rulings issued by this court and the Federal Circuit between 1991 and 1998 are discussed in this opinion. The reporter citations, in chronological order, are as follows (all captioned *Janowsky v. United States* ); 23 Cl.Ct. 706 (1991); *reversed in part, vacated in part* by 989 F.2d 1203 (table) (Fed.Cir.1993); *on remand to* 36 Fed.Cl. 148 (1996); *vacated by* 133 F.3d 888 (Fed.Cir.1998).

**4.** At oral argument (July 29, 2002) plaintiff's counsel asserted that cash in the amount of $600,000.00 was also forfeited to the Government, as indicated in the criminal indictment of the four crime family members. Transcript at 5 and 16. That indictment (appended to plaintiff's 1997 brief opposing defendant's motion for summary judgment) confirms that, upon the defendants' conviction of the felony counts listed therein, not only the horse farm, but also $600,000 cash that was "involved" in the criminal offenses "and all interest and proceeds traceable thereto," as well as the proceeds of a Chase Manhattan Bank account in the name of one of the accused [balance unstated] and any other property "involved in" the criminal enterprise or "traceable to such property" was slated to be forfeited to the United States.

forfeited as a result of the sting operation, and (c) the plaintiff. By order dated May 18, 1998, the court suspended consideration of defendant's summary judgment motion pending completion of discovery.

Defendant, while objecting to the scope of plaintiff's discovery request, furnished some of the documentation to plaintiff in redacted form on March 1, 1999. The redacted materials included the original proposal drafted by Special Agent Matthews to FBI Headquarters to approve and fund the undercover operation, as well as the four subsequent six-month extensions and the amendment. The FBI also disclosed to plaintiff's counsel redacted versions of the internal memoranda forwarding Matthews' proposals within FBI Headquarters and the meeting minutes of the FBI Undercover Review Committee that considered and approved the proposals.

On December 3, 1999, plaintiff served defendant an additional discovery request for a "list of all FBI employees who currently have or used to have contracting authority for the FBI" as referred to in the annexed Declaration of James J. Jasinski dated August 25, 1995 (which had been filed by defendant as an appendix to its original motion to dismiss the complaint).[5] Defendant responded on January 19, 2000, by furnishing plaintiff with a chart providing the names of all FBI officials who possessed contracting authority to obligate federal monies during the times relevant to the case (December 1989 to the present). The chart did not include the name of Special Agent Matthews (nor that of Special Agent Byers).

Plaintiff subsequently took the deposition of Special Agent Matthews on April 6, 2000.

Plaintiff was dissatisfied with the results of defendant's response to the discovery requests, and on May 8, 2000 filed a motion to compel the production of all written proposals from Matthews to his superiors seeking approval and funding of the sting operation leading to the forfeiture of Old Westbury Farm, and the name(s) of the person(s) in the FBI or the Department of Justice ("DoJ") who authorized and funded the operation. On June 9, 2000, defendant responded by asking the court to deny plaintiff's motion to compel. Defendant asserted that the redacted versions of the Matthews proposals turned over to the plaintiff on March 1, 1999, and the simultaneous disclosure of FBI internal memoranda and meeting minutes relating to those proposals (redacted versions), had already responded to plaintiff's discovery requests. Defendant pointed to the deposition of Special Agent Matthews who testified that "there was no discussion in the proposal of .... any additional compensation beyond the $2,375 a month [for services and expenses as a confidential informant] that was to be paid." In view of this sworn statement, defendant argued, there was no reason to disclose the sensitive and irrelevant information redacted by the FBI. At the same time, defendant offered to have the court review the unredacted FBI proposals and internal memoranda *in camera* to confirm their contents.

Defendant also referred to plaintiff's request, during the deposition of Special Agent Matthews, for the names of the members of the FBI Undercover Review Committee. There was no reason to release this information, defendant argued, because Matthews' proposals did not memorialize any compensation promise with respect to the horse farm. Accordingly, no actual knowledge of such a promise could be imputed to the members of the Undercover Review Committee, as required for the doctrine of contract ratification to apply (citing *Harbert/Lummus Agrifuels Projects v. United States*, 142 F.3d 1429, 1433 (Fed.Cir.1998)). Furthermore, defendant pointed out that the names of all FBI officials with contracting authority to obligate federal monies during the applicable time period had already been given to plaintiff in response to the discovery request of December 3, 1999.

---

**5.** James J. Jasinski was the Unit Chief of the Contract Review Unit, Finance Division, FBI Headquarters, Washington, D.C., at the time of the undercover operation involved in this action. In his 1995 declaration Jasinski stated that he was a designated contracting officer for the FBI and maintained a list of all FBI employees currently or formerly invested with contracting authority. According to Jasinski neither Matthews nor Byers, the special agents with whom plaintiff dealt in the undercover operation, had contracting authority on behalf of the FBI.

Acting on defendant's suggestion the court, on June 16, 2000, ordered defendant to produce for *in camera* review copies of all written proposals from Special Agent Matthews related to this action. Defendant produced the requested materials (the original proposal, the amendment, and the four six-month extensions) in July 2000. They were reviewed *in camera* by the court.

On October 20, 2000, the court held oral argument on plaintiff's motion to compel. By order (unpublished) dated October 24, 2000, the court denied plaintiff's motion with respect to the redacted portions of Special Agent Matthews' proposals to his superiors in the FBI and held in abeyance that part of the motion seeking the names of FBI and/or DoJ personnel who authorized and funded the undercover operation. "To establish ratification of a contract by a government agency," the court noted, "a party must show that an individual in the agency with contracting authority had 'actual or constructive knowledge' and 'demonstrated acceptance' of the contract. *Harbert/Lummus Agrifuels Projects v. United States,* 142 F.3d 1429, 1433–34 (Fed.Cir.1998)." Based on its *in camera* review of the redacted portions of the Matthews proposals the court concluded that there was nothing in the subject materials bearing on the issue of knowledge or acceptance by FBI officials (*i.e.,* ratification) of the promise alleged by plaintiff. Hence, the court denied the motion to compel production of the redacted portions of the proposals as irrelevant to the issue of contract ratification. As for the names of the FBI and/or DoJ personnel who authorized and funded the undercover operation, the court allowed discovery to continue. See *Perri v. United States,* No. 95–359C (Fed.Cl. October 24, 2000).

Around December 1, 2000, plaintiff served defendant with a second set of interrogatories, consisting of three interrogatories. Interrogatory No. 1 requested the date, time and place of every meeting Perri attended with agents of the United States in which the acquisition of the "Farm" was discussed with three specific figures targeted by the undercover operation. Interrogatory No. 2 requested the substance of the conversations among the government agents at the foregoing meetings. Interrogatory No. 3 requested all FBI documentation of the foregoing meetings.

On January 4, 2001, defendant objected to all three of plaintiff's interrogatories. With respect to Interrogatory No. 1, defendant asserted that the information requested is best known by the plaintiff since he would have been present at any and all such meetings. Defendant also argued that the information sought is overly broad and irrelevant to the pertinent issue of whether "an alleged promise by an FBI agent to pay plaintiff one-quarter of the value of any property forfeited to the [G]overnment as a result of plaintiff's assistance .... was ever ratified by an .... official who had the authority to bind the FBI in contract" (quoting from the court's order in *Perri v. United States,* No. 95–359C, Oct. 24, 2000 at 1). Defendant further asserted that no government official with contracting authority had knowledge of or ratified any such promise to plaintiff or attended any meeting where such a promise was discussed. With respect to Interrogatory No. 2, defendant opposed plaintiff's request on the same grounds as Interrogatory No. 1, with the further objection that the information sought was protected by the attorney-client or attorney work-product privileges. As for Interrogatory No. 3, defendant asserted that no documentation of the alleged meetings exists.

On February 5, 2001, plaintiff filed a motion to compel disclosure of the information sought in the second set of interrogatories. The purpose of the interrogatories, plaintiff explained, was to determine the chronological relationship between the meetings leading to the seizure of the horse farm and the time that Special Agent Matthews allegedly traveled to Washington, D.C. and received authorization for the funding of the undercover operation. The chronological relationship was necessary, plaintiff continued, to determine whether the names of the persons who authorized the funding of the operation are needed to pursue evidence of contract ratification. Defendant filed a response on February 20, 2001, opposing the motion to compel.

On May 16, 2001, oral argument was held on plaintiff's second motion to compel. The purpose of Interrogatory No. 1, plaintiff asserted, was to determine whether the meetings that culminated in the seizure of Old Westbury Farm occurred before or after the time when Special Agent Matthews, according to plaintiff, traveled to Washington, D.C. and received authorization for the funding of the undercover operation. If the meetings occurred prior to such authorization, plaintiff contended, it might be useful to depose certain FBI officials to determine whether the FBI ratified a contract with Perri concerning the sale proceeds of the horse farm. (Transcript at 5–6, 12.) With the court's encouragement the plaintiff agreed to restrict the scope of Interrogatory No. 1 to the dates, times and places of every meeting he had with the two FBI agents—Special Agent Matthews and an undercover agent identified only by an alias—whom he said he remembers being present when the acquisition of the horse farm was allegedly discussed with the three Mafia individuals. If the answer to Interrogatory No. 1, as amended, was that meetings did take place with the named individuals at which the acquisition of the horse farm was discussed, defendant agreed to revisit Interrogatory No. 3 and produce any existing documentation relating thereto. Plaintiff agreed to forego Interrogatory No. 2.

In accordance with the agreements reached at oral argument, the court issued an order (unpublished) on May 18, 2001, directing that (1) defendant should respond to plaintiff's first and third interrogatories in the manner discussed above and (2) the parties should file a joint status report by June 18, 2001, proposing a date for the close of discovery on the ratification issue. See Perri v. United States, No. 95–359C (Fed.Cl. May 18, 2001). Defendant duly served plaintiff with responses to Interrogatory Nos. 1 and 3, as amended, on May 29, 2001. On June 12, 2001, before the due date of the joint status report, plaintiff's counsel wrote a letter to the court indicating that plaintiff was serving defendant with a third set of interrogatories pertaining, inter alia, to the disclosure of the names of individuals who approved the undercover operation. On June 18, 2001, defendant filed a status report in accordance with the court's May 18 order, noting that it was not the "joint status report" ordered by the court because plaintiff's counsel had advised that he had already filed a status report (apparently referring to the letter of June 12) and served the Government with additional interrogatories. Defendant requested that the court close discovery and rule upon the Government's 1997 motion for summary judgment. On July 24, 2001, the court granted defendant until August 15, 2001, to respond to the plaintiff's third set of interrogatories. Defendant complied with that deadline, serving plaintiff with its responses to the third set of interrogatories on August 15, 2001.

Meanwhile, the original trial judge in this case, Judge Andewelt, died on August 7, 2001. The case was transferred to the current judge in October 2001. Pursuant to a court order dated November 8, 2001, defendant filed a status report, on behalf of both parties, on December 21, 2001. Defendant confirmed that it had responded to all of the plaintiff's interrogatories, but advised that plaintiff's counsel intended to seek additional discovery regarding the FBI officials who approved the undercover operation and the dates of two events that allegedly took place during the operation. Defendant stated its belief that it had produced all available materials relevant to the remaining issue of contract ratification, and opposed any further disclosures that were irrelevant, overly broad, and covered by the deliberative process and law enforcement privileges. Defendant repeated its request that the court close discovery and rule on the Government's 1997 motion for summary judgment.

Plaintiff proceeded to serve defendant with a fourth set of interrogatories on February 20, 2002. These apparently focused once again on the members of the Undercover Review Committee that approved the undercover operation, as well as the dates of two events that allegedly took place during the operation. By order dated March 14, 2002, the court granted defendant until April 9, 2002, to respond to the fourth set of interrogatories. Defendant's response was timely served upon the plaintiff.

On May 9, 2002, with the consent of the court, plaintiff filed a supplemental memorandum of law in opposition to defendant's motion for summary judgment. Plaintiff argued that the Federal Circuit's decision in *Janowsky v. United States, supra,* enunciating the doctrine of institutional ratification, precludes the court from granting summary judgment to the Government. Plaintiff recounted that it had taken the deposition of Special Agent Matthews in April 2000 and had requested, on two occasions thereafter, copies of the proposals submitted by Matthews to his superiors seeking approval for the funding of the undercover operation that led to the property forfeiture at issue in this action, as well as the names of the individuals who approved the operation. According to the plaintiff, these requests were denied by defendant "on the grounds of privilege." The requested information is within the Government's exclusive knowledge, plaintiff claims, and is critical to plaintiff in establishing institutional ratification of the FBI's alleged promise to Perri. Plaintiff asserted that no definitive ruling had been issued by the court on plaintiff's motion to compel the production of this evidence. Since defendant had refused to provide the names of the individuals who approved the funding of the operation, plaintiff argued that the Government should be either (1) equitably estopped from denying the contracting authority of Special Agent Matthews or (2) deemed to have ratified the promises made by that agent to Perri.

On June 21, 2002, defendant filed a response to plaintiff's supplemental memorandum of law. Defendant argued that plaintiff's "incomplete discovery efforts" do not preclude the court from deciding in favor of defendant on the contract issues of implied actual authority and ratification, and that the doctrine of equitable estoppel is inapplicable. Defendant requested once again that discovery be closed and that oral argument be held on defendant's motion for summary judgment.

The court held oral argument on defendant's motion for summary judgment, and the issue of discovery, on July 29, 2002. Following oral argument, the court ordered defendant to submit, for *in camera* review by the court, the minutes of the FBI Undercover Review Committee meetings that considered the undercover operation and the FBI internal memoranda forwarding Matthews' proposals within FBI Headquarters. (Redacted versions thereof have been in plaintiff's possession since March 1, 1999.) Defendant submitted the requested materials to the court on August 12, 2002.

## DISCUSSION

Summary judgment is appropriate and "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Rule 56(c), U.S. Court of Federal Claims (RCFC 56(c)). See also *Schuerman v. United States,* 30 Fed.Cl. 420, 434 (1994); *Avenal v. United States,* 100 F.3d 933, 936 (Fed.Cir.1996). A fact is material if it will make a difference in the result of a case under the governing law. Irrelevant or unnecessary factual disputes do not preclude the entry of summary judgment. See *Dart Advantage Warehousing, Inc. v. United States,* 52 Fed.Cl. 694, 697 (2002); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247–48, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). When deciding a summary judgment motion, the judge must determine whether the evidence presents a disagreement sufficient to require submission to fact finding, or whether the issues presented are so one-sided that one party must prevail as a matter of law. *Dart,* 52 Fed.Cl. at 698; *Anderson,* 477 U.S. at 250–52, 106 S.Ct. 2505; *Jay v. Secretary of Department of Health and Human Services,* 998 F.2d 979, 982 (Fed.Cir.1993), *reh'g denied, en banc suggestion declined* (1993). If the non-moving party produces sufficient evidence to raise a question as to the outcome of the case, then the motion for summary judgment must be denied. In this regard, the party opposing summary judgment is entitled to the benefit of all presumptions and inferences in resolving any doubts over factual issues. *Dart,* 52 Fed.Cl. at 698; *Matsushita Electric Industrial Co. v. Zenith Radio*

*Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).

## I.

As an initial matter, the court notes that the prior decision issued in this case by Judge Andewelt dismissing plaintiff's claim based on the U.S. Department of Justice Assets Forfeiture Fund statute, 28 U.S.C. § 524(c), is the law of the case. See *Perri v. United States,* 35 Fed.Cl. 627 (1996).[6] Plaintiff has not challenged that ruling. As discussed in Judge Andewelt's decision (and recounted earlier in this opinion), 28 U.S.C. § 524(c) is not a money-mandating statute and therefore did not create a substantive right of compensation for the plaintiff. See 35 Fed.Cl. at 631–32. Rather, the statute gave the Attorney General *discretionary* authority (which he evidently decided not to exercise in Anthony Perri's case) to pay awards from the Assets Forfeiture Fund for information or assistance leading to a civil or criminal forfeiture. *Id.* Furthermore, even if the statute had been interpreted as money-mandating, it specifically limited any such award to the *lesser* of $250,000.00 or one-fourth of the amount realized from the forfeiture, 28 U.S.C. § 524(c)(1)(C)(2). Thus, though Perri is seeking relief of several million dollars in this litigation, no award he might have received at the discretion of the Attorney General from the Assets Forfeiture Fund—in connection with the forfeiture of Old Westbury Farm and any other properties forfeited to the Government as a result of the sting operation—could have exceeded $250,000.00.

## II.

The court must now consider plaintiff's breach of contract claim. The court has jurisdiction of this action under the Tucker Act, 28 U.S.C. § 1491, which provides, in pertinent part, that "[t]he United States Court of Federal Claims shall have jurisdiction to render judgment upon any claim against the United States founded .... upon

any express or implied contract with the United States ...." 28 U.S.C. § 1491(a) (2000). The elements of an express contract and a contract implied-in-fact are identical. There must be mutuality of intent to contract, consideration, lack of ambiguity in offer and acceptance (*i.e.,* a "meeting of the minds"), and actual authority residing in the person acting on behalf of the Government to bind the United States in contract. See *City of El Centro v. United States,* 922 F.2d 816, 820 (Fed.Cir.1990), *cert. denied,* 501 U.S. 1230, 111 S.Ct. 2851, 115 L.Ed.2d 1019 (1991); *Rinaldi v. United States,* 30 Fed.Cl. 164, 167 (1993); *Humlen v. United States,* 49 Fed.Cl. 497, 503 (2001). The requirement of "actual authority" distinguishes contracts with the Government from those between private parties, in which the "apparent authority" of employees or agents may be sufficient to bind the private party principals in contract. See *Consortium Venture Corp. v. United States,* 5 Cl.Ct. 47, 49 (1984), *aff'd,* 765 F.2d 163.(Fed.Cir.1985) (table); *Johnson v. United States,* 15 Cl.Ct. 169, 174 (1988); *Roy v. United States,* 38 Fed.Cl. 184, 187 (1997); *Humlen,* 49 Fed.Cl. at 503. Moreover, the burden rests with the party asserting the existence of a contract with the United States to determine whether the person with whom it dealt had actual authority to enter into the contract on behalf of the Government. As this court explained in *Johnson,* "[a] party contracting with the Government cannot rely upon apparent authority but instead has the burden of knowing the law and ascertaining whether the one purporting to contract for the [G]overnment is staying within the bounds of his or her authority." 15 Cl.Ct. at 174.

Plaintiff alleges that he had either an express or an implied-in-fact contract with the United States in which the Government promised to pay him one quarter of the proceeds garnered from the forfeiture and sale of Old Westbury Farm (and any other properties forfeited to the Government as a result of the undercover operation). According to Perri, the elements of a binding con-

---

6. Under the law of the case doctrine "a court will generally refuse to reopen or reconsider what has already been decided at an earlier stage of the litigation." See *Applegate, et al. v. United States,* 52 Fed.Cl. 751, 765 (2002) (quoting *Suel v. Secretary of Health and Human Services,* 192 F.3d 981, 985 (Fed.Cir.1999)).

tract were met because (1) he and the FBI both intended to enter into a contract, one of whose purposes was for the Government to seize Old Westbury Farm, auction it off, and pay Perri one quarter of the resulting proceeds, (2) Perri provided valuable consideration in his role as a confidential informant and cooperative witness, thereby enabling the Government to seize and sell the farm, (3) there was no ambiguity in the FBI's contract offer to Perri or in Perri's acceptance thereof, and (4) Special Agent Matthews had the authority (either actual or implied) to enter into this contract, thereby establishing an express contract between Perri and the United States. Alternatively, if Special Agent Matthews did not have the requisite contracting authority to enter into an express contract on behalf of the FBI, Perri asserts that an implied-in-fact contract came into being, either because (a) the agreement was ratified by higher ranking FBI officials who did have the requisite contracting authority, or (b) the Government received the benefit of Perri's services (*i.e.*, the proceeds resulting from the forfeiture and sale of the horse farm) and is therefore obligated to pay him, on a *quantum meruit* basis, for the value of those services.

*Was there an express contract?*

A.

■ Perri alleges that Special Agent Matthews recruited him to render assistance to the FBI in its undercover operation, a major aim of which was to induce one of the individuals targeted by the operation to forfeit Old Westbury Farm to the United States. According to Perri, Matthews "assured" him that he would receive a substantial reward from the United States after the successful completion of the operation and that the "usual" amount of such a reward was 25 % of the proceeds realized from the forfeiture and sale of the subject asset. Perri further alleged, in his first amended complaint, that Matthews "represented" to plaintiff that he had "full authority to obligate" the United States to pay a reward in the amount they had discussed.

Plaintiff's claim notwithstanding, the record contains no evidence of any agreement between Perri and Special Agent Matthews, written or oral, regarding Old Westbury Farm. In fact, the only piece of documentary evidence on point—the Memorandum of Understanding Perri completed with the FBI when he entered the Witness Security Program in September 1992—undermines plaintiff's assertion that any such agreement existed. On page 13 of that 20–page document, in response to the question of what, if any, promises he had received from government agents or attorneys, Perri wrote:

"Agent Matthews had told me that at [the] end of things I would be given a lump sum of money *based on how much they gave me while I was helping them.*"

Exhibit 2, Def. MSJ, at 12 (emphasis added). Perri received just under $81,000.00 while "helping" the FBI as a confidential informant and cooperative witness. If Perri had actually been promised one quarter of the proceeds from the sale of Old Westbury Farm (and other property forfeited in the undercover operation)—for which he has asserted a vastly greater claim of $1.4 million, at a minimum, in this litigation—it is inexplicable how he could have failed to provide information about that promise in the MoU. Perri was specifically directed to "enter all promises or agreements" not dealt with elsewhere in the MoU. The fact that he made no mention in this crucial document of Old Westbury Farm or a promise by Special Agent Matthews to compensate him with a fixed percentage of its sale price militates against a finding that any such promise was made.

Indeed, the record includes a "Declaration of William R. Matthews," dated May 18, 1998, denying the existence of any such agreement. In his declaration Matthews stated that:

I never promised to pay the plaintiff any amount of money reflecting a percentage of the value of any property (including Old Westbury Farm) seized and forfeited as a result of the FBI's undercover operation and investigation.

. . . . [T]here is no writing in existence reflecting such an alleged promise.

. . . . [S]uch a promise would have been recorded in writing in the FBI's 137 (Confidential Informant) File or 270 (Coopera-

tive Witness) File for this undercover operation and investigation.

The pertinent 137 Files and 270 Files .... have already been produced to the plaintiff, and these files reflect, by virtue of what they do not include, that no such promises ... were ever made to the plaintiff.[7]

An identical declaration was signed the same day by Special Agent Christopher J. Byers, who succeeded Special Agent Matthews as Perri's FBI contact in the undercover operation during the summer of 1992. Thus, both FBI agents with whom plaintiff dealt directly as a confidential informant and cooperative witness deny that they made any promise to Perri regarding payment to him of a percentage of the auction price of Old Westbury Farm, and the FBI files where a promise of that nature would be recorded contain no evidence thereof.

In his subsequent deposition; on April 6, 2000, Special Agent Matthews offered additional testimony on the nature of the FBI's monetary promises to plaintiff. In response to a question by plaintiff's counsel as to what SSA George Togliatti meant to say in his October 5, 1992 letter (on behalf of SAC Randolph Prillaman) to the Deputy U.S. Marshal in San Jose in the sentence reading: "No further payments are anticipated until the completion of all criminal and forfeiture proceedings," Matthews testified as follows:

All along, the issue of whether Mr. Perri was to be paid anything at the end of the operation was never addressed. It was always, let's just see what happens. And then in the end, the decision will be made whether or not he should be compensated additionally or not. And that was the position I always had, and that was the position George Togliatti always took. So I think what he's saying there is .... we're not committed to anything. We're just going to see how everything works out, and then we'll make a decision whether we feel he should be compensated additionally

or not..... [Mr. Togliatti] would not have made the final decision, but he would have been the one to initiate the decision.

Deposition at 105–106.

In answer to a question from plaintiff's counsel as to whether any monetary arrangements were discussed in the proposal for the undercover operation (sent by the Las Vegas field office to FBI Headquarters), Matthews indicated that the only amounts discussed were the $2,000.00 (for services), or $2,375.00 with expenses, to be paid monthly. "But there was no discussion in the proposal of any long-term beyond-the-operation compensation or any additional compensation beyond the $2,375.00 a month that was to be paid." *Id.* at 108. The subject proposal, along with the proposed amendment and the six-month extension requests, are part of the record in this case and were reviewed *in camera* by the court. They confirm Matthews' assertion that the only monetary arrangements discussed with respect to the plaintiff were the monthly payments described above, supplemented by a handful of additional payments, on the same order of magnitude, for other specific expenses Perri incurred in the undercover operation.

Asked to speculate on why Perri believes he was entitled to additional compensation as a result of the forfeiture of Old Westbury Farm, Matthews testified as follows:

I think he sees this as an opportunity to .... get additional compensation. Maybe he felt that he would get something in the end from everything that we did. But there was no discussion about it. There was no promises (*sic*) made. And at the time he was very happy. I got him a great job at Caesar's palace. I was giving him $2,375 a month .... on top of that. He was living a very nice life. From a guy who had nothing when he came to me, now [he] had a house, his wife came back and joined him with his daughter, they bought furniture and furnished the whole house,

7. The 137 and 270 files in this case contain the payment justification memoranda and other informational communications generated by FBI officials, mostly from Special Agents Matthews and Byers to their superiors, pertaining to Anthony Perri's activities as a confidential informant (137 File) and cooperative witness (270 File) in the Group 1 Undercover Operation from 1990 to 1993. As indicated earlier in this opinion, the FBI's payments to Perri for his "services" and "expenses" in the undercover operation totaled $80,911.50.

he had a great job, and was living a great life. . . . . But then when it came to an end and he lost all that [*i.e.*, when the undercover operation was completed, his casino job ended, the monthly payments ceased, and he was moved into the Witness Security Program] he's trying to figure out a way to get more money. I think that's his motivation.

*Id.* at 109–110. Thus, Special Agent Matthews reaffirmed in his deposition that he made no promises to plaintiff with respect to Old Westbury Farm and that the only compensation he ever discussed with Perri were the monthly payments of $2,375.00.[8] Even if the award feature of the Assets Forfeiture Fund statute, 28 U.S.C. § 524(c), may have been mentioned in one context or another during Matthews' dealings with Perri, the court finds no basis to conclude that Matthews misappropriated the Attorney General's *discretionary* payment authority under the statute to make a unilateral, and unauthorized, *promise* to pay Perri 25% of the sale price of the horse farm.

Regardless of what plaintiff may have thought, or hoped, he was being promised by Matthews with respect to Old Westbury Farm (and other property forfeited to the Government as a result of the undercover operation), it is clear that important elements of contract formation were absent here. The declaration and deposition of Special Agent Matthews, together with the contemporaneous FBI documentation of the undercover operation, indicates that there was no mutuality of intent to contract with respect to Old Westbury Farm. There was no "meeting of the minds" between Matthews and Perri that the FBI would pay its confidential informant one quarter of the proceeds generated by the forfeiture and sale of the horse farm or any other property. Any such promise, as Special Agents Matthews and Byers both declared, would have been documented in the plaintiff's 137 File or 270 File with the FBI.

There is no evidence of such a promise in either of those files, however, nor in the proposals relating to the undercover operation or any other materials before the court. The results of the discovery process conducted in this matter since 1998 strongly suggest that no such evidence exists. So the record in this case does not support plaintiff's contention that he had an express contract with the United States relating to Old Westbury Farm.

Even if such evidence existed, an express contract between Perri and the United States would not come into being unless Special Agent Matthews had the requisite contracting authority. See *City of El Centro, supra*, 922 F.2d at 820. The record includes the August 25, 1995 "Declaration of James J. Jasinski," the Unit Chief of the Contract Review Unit at FBI Headquarters in Washington, D.C. at the time of the undercover operation at issue.[9] Jasinski, who was "designated Contracting Officer for the FBI," declared that he "maintain[ed] a list of all FBI employees who currently have or used to have contracting authority for the FBI, and a review of that list does not indicate that Special Agents Byers and Matthews had contracting authority to enter into any contract or contracts between the FBI and [Perri] as alleged in plaintiff's complaint." Declaration at 1–2. The list to which Jasinski referred in his affidavit was furnished to plaintiff in January 2000, in response to plaintiff's discovery request of December 3, 1999, and is part of the record in this case.

Jasinski's information with respect to the lack of contracting authority in field agents like Matthews and Byers is confirmed by the FBI Field Office Manuals of Investigative Operations and Guidelines [MIOG] and Administrative Operations and Procedures [MAOP] (Exh. 4, Def.MSJ). The MAOP, in a section entitled "Contractual Agreements," provides that all documents committing FBI funds must be executed by a contracting

---

8. This testimony accords with the FBI's internal report of February 9, 1993, closing its investigation of the alleged promise(s) made by Special Agent Matthews, which concluded that "[n]o services contract was executed with PERRI and no information regarding any promises to PERRI was obtained." Exh. 2, Def. MSJ, at 8.

9. As indicated earlier in this opinion, Jasinski's declaration was appended to defendant's motion to dismiss plaintiff's first amended complaint, filed on September 25, 1995.

officer at FBI Headquarters. If necessary a Special Agent in Charge may be authorized to execute a contract committing FBI funds, and the SAC's signature can be adopted afterwards by a contracting officer at Headquarters. There is no provision granting special agents, like Matthews and Byers, any sort of contracting authority. Another section of MAOP, entitled "Procurement Authority," states that contracts for goods and services may be entered into and signed on behalf of the Government only by contracting officers, and that any procurement of goods or services exceeding $25,000.00 necessitates a formal contract. Given this restriction on contracting authority, it is obvious that Special Agent Matthews, who was not a contracting officer, had no authority to enter into a "services" contract with Perri committing $1.4 million, or more, of FBI or other government funds as a reward to Perri for his assistance in the undercover operation.

In fact, the FBI Field Office Manuals confirm that Special Agent Matthews did not even have the authority to pay Perri, on behalf of the FBI, the much smaller amounts he received for his "services" and "expenses" as a confidential informant and cooperative witness. The MIOG, for example, provided that all payments to informants must be requested by memorandum to the SAC. These memoranda had to include information on the total amount previously paid to the informant, the date the file was opened, and a justification for the additional payment requested. This is exactly the procedure followed by Special Agent Matthews, and later Byers, in seeking and obtaining authorization from SAC in the Las Vegas field office for every payment that Perri received from the FBI between 1990 and 1993. There is no evidence, and plaintiff does not allege, that the Government breached any promises to him with respect to paying for his "services" and "expenses" during his time as a confidential informant and cooperative witness. The SAC approved each and every payment to Perri requested by Special Agents Matthews and Byers, which totaled nearly $81,000.00.

## B.

■ Plaintiff argues that, regardless of whether Special Agent Matthews (or Byers) had actual contracting authority, they had "implied actual authority" to enter into a contract with Perri promising him one quarter of the proceeds derived from the forfeiture and sale of Old Westbury Farm. The doctrine of implied actual authority was first articulated by the Federal Circuit in *H. Landau & Co. v. United States,* 886 F.2d 322 (Fed.Cir.1989). In that case the Federal Circuit ruled that "implied actual authority, like expressed actual authority, will suffice [to hold the Government bound by the acts of its agents]. 'Authority to bind the government is generally implied when such authority is considered to be an *integral part of the duties assigned to a government employee.*'" *Id.* at 324 (quoting J. Cibinic & R. Nash, Formation of Government Contracts 43 (1982) (emphasis added)).[10]

■ The concept of implied actual contracting authority was recognized by this court again in *Cruz–Pagan v. United States,* 35 Fed.Cl. 59 (1996): "[I]n appropriate factual settings actual authority can be implied and an express grant of authority is not necessary." 35 Fed.Cl. at 60. In *Cruz–Pagan* the plaintiff assisted Drug Enforcement Agency (DEA) officials as an informant in securing a forfeiture to the Government of more than $900,000.00 and sought a reward of 25 % of that amount based on alleged oral promises made to him by DEA field agents. Plaintiff argued that contracting authority was an "integral part of the duties assigned" to DEA agents because it was vital to their "duties of maintaining contact and exercising control over informants." 35 Fed.Cl. at 61. After restating an earlier ruling in the case that an affidavit by a DEA official denying that its field agent(s) have contracting authority was insufficient

---

**10.** In *Landau* the Federal Circuit did not actually hold that the government employees at issue had implied actual authority to bind the government in contract, but simply that it was possible they had such authority. On remand this court's predecessor ruled that there was no evidentiary basis to find implied actual contracting authority. See *H. Landau & Co. v. United States,* 20 Cl.Ct. 400, 406–07 (1990).

by itself to defeat plaintiff's claim that the agent had implied actual contracting authority, the court engaged in a fact-intensive analysis of how DEA agents obtain the assistance of informants and how the DEA compensates informants for their services. The court determined that the DEA had established procedures by which higher officials, acting on field agent recommendations, evaluated informants' services and compensated them based on the fair and reasonable value of their services to the DEA. "[B]ecause reasonably efficient alternatives appear to exist to create the desired expectation of compensation," the court concluded, "it would not be necessary or essential for DEA to grant contracting authority to its field agents .... to enable [them] to carry out their assigned duties ...." *Id.* Accordingly, the court found that DEA agents did not possess implied actual authority to enter into compensation contracts with informants (*i.e.*, contracting authority was not an integral part of an agent's assigned duties in securing the assistance of informants). *Id.* at 61–62. As an additional ground for denying implied actual authority, the court found that the DEA's internal regulations specifically precluded DEA field agents from promising an award to any individual. *Id.* at 62–63.

Perri argues that his case for implied actual authority is stronger than that of *Cruz–Pagan.* For one thing, the MIOG, unlike the DEA Agent's Manual, does not expressly prohibit FBI agents from promising awards to individuals. Furthermore, the MIOG places great responsibility on FBI field agents to develop confidential sources and gives them wide latitude to accomplish this task. Plaintiff cites MIOG § 137–2(3), which states as follows:

> Each Agent involved in investigative activity is obliged to develop and operate productive informants. Those Agents who

cannot develop productive informants must overcome the lack of informants through some other substantial contribution, such as the continued investigative assignments of Cooperative Witnesses. The proper operation of informants is a basic skill which requires dedication and ingenuity. The success each agent enjoys normally depends on the strength of the Agent's personality and resourcefulness exercised in *obtaining* information.

Ignoring the fact that this provision applies to "the development and operation of *informants,*" plaintiff contends that the language must be interpreted as making contracting an integral part of the agent's assigned duties in dealing with informants *and cooperative witnesses.* Perri asserts that he functioned on behalf of the FBI at all times as a cooperative witness, not as a confidential informant, despite his designation by the Government as a confidential informant from 1990 to 1992 and a cooperative witness from 1992 to 1993.[11] In contrast to the DEA in *Cruz–Pagan,* plaintiff asserts, when Special Agent Matthews made his alleged promise to Perri concerning Old Westbury Farm the FBI had not yet adopted procedures for evaluating the services of cooperative witnesses and determining their proper compensation. Therefore, FBI agents must have had implied actual authority to enter into compensation contracts with cooperative witnesses like the plaintiff.

The court discerns no reason to question the accuracy or validity of the FBI's classification of Anthony Perri as first a confidential informant and only later, after the indictment of the four crime family members, as a cooperative witness. The record does not indicate that the FBI had a fixed intention at the time it opened Perri as an informant to use him as a witness in any subsequent trial that might take place. It was Perri who

---

11. Perri contends that he should have been categorized as a "cooperative witness" from the outset of his relationship with the FBI, based on the language in MIOG, paragraph 137–1.2, defining a cooperative witness as: "An individual whose relationship with the Government is concealed until testimony is required at trial and who, on a continuing basis and under the direction of an Agent, contributes substantial operational assis- tance to the resolution and/or direction of a case through active participation in the investigation. These individuals (*sic*) should be handled as witnesses and should not be opened and operated as informants." By comparison, MIOG, paragraph 137–1, defines an informant as "any person or entity who furnishes information to the FBI on a confidential basis."

initiated contact with the FBI in December 1989, and the FBI had to find out over time how useful he would be as a confidential informant, and whether any indictments were likely to ensue, before it could decide whether to employ him as a cooperative witness. In accordance with its internal regulations, the FBI has the prerogative to classify as it sees fit the individuals associated with its investigative operations, and decisions of this nature are entitled to deference from this court. See *Chevron U.S.A. v. Natural Resources Defense Council,* 467 U.S. 837, 842–45, 104 S.Ct. 2778, 81 L.Ed.2d 694, *reh'g denied,* 468 U.S. 1227, 105 S.Ct. 28, 82 L.Ed.2d 921 (1984). Moreover, the record establishes that even before 1990, and thus at all times pertinent to this claim, the MIOG gave SACs in the context of their investigative operations unilateral authority to approve payments aggregating up to $5,000.00, and allowed them to make further payments exceeding that threshold providing FBI Headquarters approved, *regardless of whether the recipient was a confidential informant or a cooperative witness.* (Exh. 4, Def. MSJ, at 17, 24–25).

Defendant argues that, as with the DEA agents in *Cruz–Pagan,* the facts militate against any finding that the FBI agents in this case had implied actual contracting authority to enter into a compensation agreement with Perri. Contracting authority was not integral to the assigned duties of FBI field agents, defendant maintains, because the FBI had ample alternative means to develop and compensate confidential informants as well as cooperative witnesses. As discussed above, Special Agents in Charge, to whom field agents like Matthews and Byers directly reported, were authorized to make limited payments (aggregating $5,000.00) to informants and cooperative witnesses, and FBI Headquarters was authorized to approve further payments above that amount. Given this open-ended authority of SACs to request, and FBI Headquarters to approve, payments to confidential informants and cooperative witnesses, it was unnecessary for the FBI to invest field agents with implied actual contracting authority to enter into compensation agreements with such individuals. Furthermore, defendant argues

that the FBI Manuals' non-inclusion of field agents among the individuals vested with contracting authority (to commit federal funds) is legally akin to the specific exclusion of DEA agents in the DEA Manual.

Defendant cites this court's ruling in *Roy v. United States,* 38 Fed.Cl. 184 (1997), as directly dispositive of plaintiff's "implied actual authority" argument. *Roy,* like the case at bar, involved a plaintiff who, though he was paid by the FBI for his services ($100,-000.00) and expenses ($84,424.77) as a confidential informant, filed suit against the United States alleging that FBI field agents breached oral promises to pay him up to 25 % of the value of the property seized as a result of his services, as well as an unspecified lump sum in lieu of entering the Witness Security Program. The court held that the field agents had no express contracting authority to enter into the agreements alleged by plaintiff, and that implied actual contracting authority was "not essential to ensure that FBI SAs [Special Agents] successfully exercise their informant-based responsibilities." 38 Fed.Cl. at 190. Rather, "reasonably efficient alternatives" were available to field agents "to develop and control informants without having authority contractually to bind the FBI." *Id.* "Much like the DEA agents in *Cruz–Pagan,*" the court went on, "the FBI SAs .... can achieve their goal of inducing informant cooperation by following established [FBI] Manual payment procedures." *Id.* Thus, contracting authority was "not integral" to the informant responsibilities of FBI special agents, the court concluded, making the doctrine of implied actual authority inapplicable to the facts of the case. *Id.* As an alternative ground for rejecting plaintiff's "implied actual authority" argument, the court discussed the fact that the FBI Manual vested only certain individuals with authority to make compensation promises and the non-inclusion of special agents among those individuals "is analogous to the specific exclusion discussed in *Cruz–Pagan* [*i.e.,* the preclusion of DEA field agents from promising awards]." *Id.* at 191. It was "simply not reasonable to imply that [the FBI] granted or delegated such [contracting] authority to its [special agents]," the court

concluded. *Id.* (quoting *Cruz–Pagan*, 35 Fed.Cl. at 62).

The court agrees with defendant that the doctrine of implied actual contracting authority is inapplicable in the case at bar. *Roy* is directly on point and the court finds no reason to depart from the ruling in that case. Contracting authority to enter into a compensation agreement was not integral to the duties of Special Agent Matthews (or Special Agent Byers) in developing and controlling Anthony Perri as a confidential informant and cooperative witness because reasonable alternative means were available to the agents. The FBI Field Office Manuals, which did not invest special agents with authority to make compensation promises, set forth detailed procedures for Matthews to follow in obtaining the approval of the Special Agent in Charge (of the Las Vegas field office) for the initial payments to Perri (up to $5,000.00) and of FBI Headquarters for all subsequent payments to Perri. These procedures, which resulted in compensation payments to Perri of nearly $81,000.00, proved perfectly adequate in securing the assistance of plaintiff for the duration of the undercover operation. Consistent with this court's prior decisions in *Cruz–Pagan* and *Roy*, therefore, the court holds that there was no implied actual contracting authority in Special Agent Matthews (or Special Agent Byers) to enter into any compensation agreement with the plaintiff promising him a percentage of the sales proceeds of Old Westbury Farm or other property forfeited as a result of the FBI sting operation.

*Was there an implied-in-fact contract?*

### A. Ratification

■ Plaintiff argues that, regardless of whether Special Agent Matthews had actual or implied actual contracting authority to obligate FBI funds, he made a compensation promise to Perri in regard to Old Westbury Farm that was "ratified" by higher officials in the FBI who did have the requisite contracting authority. This ratification, plaintiff contends, resulted in an implied-in-fact con-

tract between Perri and the United States. The principle of ratification comes into play when a government agency affirms, rather than disavows, an unauthorized promise by its agent(s). As explained by this court in *Janowsky v. United States*, 23 Cl.Ct. 706, 715 (1991): [12]

> [A] contract is voidable at the option of the government when the official who made the agreement lacked actual authority to bind the government. See *Empresas Electronics [Electronicas] Walser, Inc. v. United States*, 223 Ct.Cl. 686, 688, 650 F.2d 286 [Ct.Cl.1980], *cert. denied*, 449 U.S. 953, 101 S.Ct. 357, 66 L.Ed.2d 217 (1980) (an agency "can disavow" the unauthorized promises of its agents); Rest. (2d) Contracts, § 7 (a principal is free to affirm or to disavow the unauthorized promises of its agent, and thus contracts entered into by the agent acting beyond the scope of his authority are not void but are voidable by the principal).

■ Thus, the Government may, if it so chooses, ratify an unauthorized (or voidable) contract. As a manifestation of such intent, it has long been recognized by this court and its predecessor, the Court of Claims, that "even if a government official lacks actual authority to bind the United States by his promise, *knowing acceptance of benefits by those empowered to bind the government* can result in ratification of the unauthorized official's promise." *Janowsky, supra*, 23 Cl.Ct. at 715–16 (note 10) (emphasis added), citing *Silverman v. United States*, 230 Ct.Cl. 701, 710, 679 F.2d 865 (1982); *Philadelphia Suburban Corp. v. United States*, 217 Ct.Cl. 705, 707, 1978 WL 8442 (1978); *New York Mail and Newspaper Transportation Co. v. United States*, 139 Ct.Cl. 751, 759, 154 F.Supp. 271 (1957), *cert. denied*, 355 U.S. 904, 78 S.Ct. 332, 2 L.Ed.2d 260 (1957). The attributes of ratification were further described by the Federal Circuit in *Harbert/Lummus Agrifuels Projects v. United States*, 142 F.3d 1429, 1433–34 (Fed.Cir.1998). ("[Unauthorized agreements] may subsequently be ratified .... if the ratifying officials have actual

---

12. The Claims Court opinion was reversed in part, vacated in part and remanded (on grounds unrelated to the passage quoted herein) in an unpublished opinion by the Federal Circuit, *Janowsky v. United States*, 989 F.2d 1203 (Table) (Fed.Cir.1993).

or constructive knowledge of the unauthorized acts [citing *United States v. Beebe*, 180 U.S. 343, 354, 21 S.Ct. 371, 45 L.Ed. 563 (1901) ] .... Moreover, ratification must also be based on a *demonstrated acceptance of the contract.* [Citation omitted.] *Silence in and of itself is not sufficient to establish a demonstrated acceptance of the contract by the [contracting officer].")* (Emphasis added.)

■ In another recent opinion, *Janowsky v. United States*, 133 F.3d 888 (Fed.Cir.1998), the Federal Circuit vacated a ruling of this court, *Janowsky v. United States*, 36 Fed.Cl. 148 (1996), granting summary judgment to the Government based on the lack of contracting authority in the government agent with whom plaintiff negotiated a proposed agreement because the court had not considered whether the Government ratified the proposed contract by allowing the underlying operation to continue and receiving the benefits therefrom. 133 F.3d at 892. In *Janowsky* FBI agents persuaded the plaintiff to cooperate in an undercover investigation aimed at police officials, organized crime members, and vending company owners, among others, which involved transforming the plaintiff's vending machine business into an FBI-operated facade. Janowsky was concerned about the viability and value of his business once the investigation was concluded, anticipated that he would have to sell it, and had his attorney draft a proposed agreement with the FBI to protect his financial interests. Under the proposed agreement the FBI was to guarantee that Janowsky would receive at least $300,000.00 by the close of the operation, comprised of rewards from the FBI, the sale price of the business, and payment by the FBI of any remaining shortfall. Plaintiff signed the proposed agreement, which the FBI's Special Agent in Charge of the Gary, Indiana office enclosed in a letter to the local U.S. Attorney with the notation that FBI Headquarters had final authority to approve the agreement. FBI Headquarters did not approve the proposed agreement and a different proposal, without input or signature from Janowsky, was subsequently sent by the U.S. Attorney to FBI Headquarters. Before any further action could be taken on the proposed agreement the FBI indirectly exposed the plaintiff, thereby endangering his family's safety and inducing him to continue working with the Bureau in its investigation. The FBI ultimately arrested several suspects, recovered $47,000.00 in back taxes, and seized property worth $650,000.00. Plaintiff sued in the Court of Federal Claims, alleging that he had an implied-in-fact contract with the FBI to compensate him. The court granted summary judgment to the Government, plaintiff appealed, and the Federal Circuit remanded to the trial court to determine whether the FBI's conduct—allowing the sting operation to continue and reaping benefits therefrom—constituted ratification of the proposed contract.[13]

Along the same line as *Janowsky*, the Court of Federal Claims denied the Government's motion for summary judgment in *Dolmatch Group, Ltd. v. United States*, 40 Fed. Cl. 431 (1998), because there were genuine issues of material fact as to whether an agreement plaintiff negotiated with a representative of the Smithsonian Institution who did not have contracting authority was ratified by someone who had the requisite contracting authority. The case involved an exchange of letters and contract proposals which the plaintiff claimed amounted to an express or implied-in-fact contract for Dolmatch to market the Smithsonian Video Collection. In view of unresolved factual disputes about the extent of involvement and contracting authority of a particular Smithsonian official at least peripherally involved in the negotiations, as well as the vagueness of the Smithsonian's internal regulations pertaining to the delegation of contracting authority, the court ruled that neither party was entitled to summary judgment. 40 Fed.

---

13. The long-running judicial saga of Janowsky and the United States ended with a four-day trial, at the conclusion of which the judge announced his findings of fact and conclusions of law in open court. A few days later the court issued an order directing that judgment be entered in favor of the Government and that the complaint be dismissed. *Janowsky v. United States,* No. 90–3846C (Fed.Cl. August 24, 1998). .

Cl. at 438–39.[14]

Plaintiff argues, in the vein of *Janowsky* and *Dolmatch*, that there is sufficient evidence in this case of the FBI's ratification of Special Agent Matthews' compensation promise to Perri to preclude an entry of summary judgment in favor of the Government. Plaintiff points to the FBI letter of October 5, 1992, signed by Supervisory Special Agent George Togliatti on behalf of Special Agent in Charge Randolph Prillaman and addressed to a Deputy U.S. Marshal in San Jose, California, in which the FBI recognized that "Mr. Perri's assistance was invaluable in an investigation that to-date has resulted in four indictments and the seizure of real estate valued at eleven million dollars." After requesting the Deputy U.S. Marshal's help in expediting a $1,000.00 payment to Perri, who had just entered the Witness Security Program, the letter stated that "[n]o further payments are anticipated *until the completion of all criminal and forfeiture proceedings.*" (Emphasis added.) According to plaintiff, this letter was an acknowledgement by an FBI official with "some contracting authority" that the FBI was ratifying Special Agent Matthews' promise to Perri—*i.e.*, that the FBI intended to honor Matthews' commitment to further compensate Perri (beyond the amounts he had received as a confidential informant and cooperative witness) based on the proceeds realized by the Government in the forfeiture and sale of Old Westbury Farm and other property forfeited as a result of the undercover operation.

Defendant contests plaintiff's interpretation of the foregoing letter. The record includes a declaration, dated June 23, 1997, by Special Agent Christopher Byers (who succeeded Matthews as Perri's FBI contact in the summer of 1992), stating that he was "very familiar with the contents, and intent, of the above-referenced October 5, 1992 letter as *I wrote it.*" (Exh. B, Def. reply brief filed July 7, 1997, emphasis added.) Byers declared that:

The sole purpose for the October 5, 1992 correspondence was to transmit a $1,000 payment to Mr. Perri through the Marshal Service because Mr. Perri had recently enrolled in the Federal Witness Security Program. Payments to cooperative witnesses once they have entered the Federal Witness Security Program are rare since such financial transactions may threaten the cooperative witness' anonymity. Through the sentence in question ["No further payments are anticipated until the completion of all criminal and forfeiture proceedings."], I was simply attempting to allay any concern by the Marshal Service that such payments would become commonplace, while not foreclosing the *possibility* that F.B.I. Headquarters would approve a modest, *discretionary final "thank you" payment* to Mr. Perri for his "services" at the conclusion of the then-pending judicial proceedings. Such a discretionary payment, however, would not be based upon a fixed percentage or otherwise tied to the outcome of any forfeiture proceedings.

Neither the sentence, nor the letter, in question was drafted to promise, or otherwise acknowledge a promise, to pay Mr. Perri a sum certain based upon a percentage of forfeiture proceeds stemming from the F.B.I. undercover operation in issue.

(Emphasis in the original.) In other words, the reference to "the completion of all criminal and forfeiture proceedings," according to Byers, was intended to indicate the time frame when Perri might receive an additional discretionary payment from the FBI for his "services" as a confidential informant and cooperative witness. It was not intended to indicate that the FBI was obligated to make such a payment or that any payment amount would be based on a percentage of the auction price of Old Westbury Farm or other property forfeited in the undercover operation.

Special Agent Byers' interpretation of the October 5, 1992 letter is consistent with plaintiff's own statement in the contempora-

---

**14.** Following a two-day trial, however, the judge dismissed the complaint and judgment was entered for the defendant. *Dolmatch Group, Ltd. v. United States,* No. 96–363C (Fed.Cl. April 9, 1999).

neous "Memorandum of Understanding" ("MoU") he executed with the FBI at the time he entered the Witness Security Program in September 1992. As previously discussed, in response to the question of what, if any, promises he had received from government agents or attorneys, Perri wrote:

Agent Matthews had told me that at end (*sic*) of things I would be given a lump sum of money based on how much they gave me while I was helping them.

Perri's statement made no reference to Old Westbury Farm or other property forfeited to the Government as a result of the undercover operation. Nor did it mention any promise to pay him a fixed percentage of the proceeds generated by the forfeiture and sale of such property. What he did say—*i.e.*, that Special Agent Matthews promised him an additional payment "based on how much they gave me while I was helping them"—appears to link the amount of any such payment to the sum he received for his services as a confidential informant and cooperative witness, which totaled just under $81,000.00.

For the purpose of "clarifying" what Special Agent Matthews had promised him, plaintiff submitted an affidavit, dated June 5, 1997, in which he asserted that, in addition to the monthly "salary" he received from the FBI of $2,000.00 plus expenses, Matthews promised two lump sum payments. The first of those payments was the one "discussed" in the MoU, according to Perri, while the second payment was not discussed in the MoU. As explained by Perri:

The so called Memorandum of Understanding was prepared in connection with my entrance into the Witness Protection Program. It was done, as had been explained to me at the time, for the purpose of apprising the Marshals what monies I believed I was going to receive that would enable me to start a new life upon entering the Witness Protection Program.

That Memorandum of Understanding was not intended to address the second lump sum payment since it was unrelated to my entrance in the Witness Protection Program and was contingent upon subsequent events, namely; the outcome of the trial [of the four indicted crime family members] and the ultimate resolution of ownership of the horse farm.

Plaintiff's contention, therefore, is that the MoU he signed with the FBI did not cover the agreement he made with Special Agent Matthews in regard to Old Westbury Farm. The court finds plaintiff's explanation unconvincing. A reading of the pertinent language on page 13 of the MoU does not indicate that a promise regarding the horse farm, if it existed, was meant to be excluded from that document. To the contrary, the MoU directed Perri to report "all agreements or promises" made by government agents or attorneys. Despite this explicit language, plaintiff made no mention in the MoU of any promise by Special Agent Matthews of a lump sum payment after the forfeiture and sale of Old Westbury Farm. The most plausible explanation for this omission, in the court's view, is that no such promise was made by Matthews.

In the court's judgment, defendant's interpretation of the FBI's letter of October 5, 1992, which was contemporaneous with the MoU, is more credible than plaintiff's. The court does not discern any evidence in the letter of a promise by anyone in the FBI to pay Anthony Perri 25 % (or any other percentage) of the proceeds resulting from the forfeiture and sale of Old Westbury Farm. The language of the letter does not say anything about the nature or amount of any future payment(s) the FBI might make to Perri. The pertinent phraseology—"no further payments are anticipated until the completion of all criminal and forfeiture proceedings"—is perfectly consistent with Special Agent Matthews' assertion that the FBI was not considering anything more than a "modest, discretionary final 'thank you' payment" at the conclusion of judicial proceedings against the indicted Mafia individuals. The small size of the payment specifically discussed in the letter ($1,000.00) makes it even less conceivable that the reference to possible "further payments" could be interpreted as a monetary promise on the scale ($1.4 million, at a minimum!) asserted by the plaintiff. Neither George Togliatti nor Randolph Prillaman, in whose names the October 5, 1992 letter was sent, was a contracting officer for the FBI. Thus, neither had the au-

thority to make or ratify a compensation promise of the magnitude alleged by Perri.[15]

In sum, the record does not establish that any FBI official with contracting authority ratified a promise to plaintiff by Special Agent Matthews that the FBI would pay him an amount equal to one quarter of the sales proceeds of Old Westbury Farm (and any other property forfeited in the undercover operation), or that Matthews ever made such a promise. Plaintiff's reliance on *Janowsky*, 133 F.3d 888 (Fed.Cir.1998) and *Dolmatch*, 40 Fed.Cl. 431 (Fed.Cl.1998), in arguing against defendant's summary judgment motion, is misplaced because in both of those cases, unlike the case at bar, there was undisputed documentation of the proposed contracts at issue. In *Janowsky* and *Dolmatch* there were genuine issues of material fact as to whether the unauthorized contract instruments had been ratified by government officials with contracting authority, which precluded granting summary judgment to the Government. In the case at bar there is no convincing evidence of any unauthorized promise or contract on which a ratification argument can even be advanced.

### B. Motion to Compel

■■■ In his supplemental memorandum of law, filed on May 9, 2002, plaintiff argued that the Government's refusal to answer his interrogatories had prevented him from establishing the "institutional ratification" of his alleged contract with the FBI. Plaintiff reminded the court that he had previously moved for an order compelling defendant to turn over to the plaintiff copies of all written proposals made by Special Agent Matthews to his superiors seeking approval and funding of the undercover operation that led to the forfeiture of Old Westbury Farm, as well as the name(s) of all person(s) in the FBI or DoJ who authorized and funded the operation. (Plaintiff was referring to his first motion to compel, filed on May 8, 2000.) According to the plaintiff, no definitive ruling was issued by the court.

Plaintiff's assertion that "no definitive ruling" was made on his (first) motion to compel is inaccurate. In its order following oral argument in October 2000, the court denied that part of the motion which sought production of the redacted portions of Special Agent Matthews' proposals relating to the undercover operation. The court noted that the Government had already delivered the proposals to plaintiff with certain portions redacted on grounds of privilege, and had submitted the unredacted proposals to the court for *in camera* review. After reviewing the unredacted proposals *in camera* the court concluded that they did not contain any evidence or information bearing on the issue of whether someone with contracting authority in the FBI knew about or accepted Matthews' alleged promise to the plaintiff. Accordingly, the court denied the motion to compel production of the redacted portions of the proposals because they were irrelevant to the issue of contract ratification. See *Perri v. United States*, No. 95–359C (Fed.Cl. October 24, 2000). That order is the law of the case, and the plaintiff has not presented any reason—such as a demonstrable error, injustice, or other "special circumstances"—for the court to reconsider that ruling now. See *Mendenhall and CMI Corp. v. Barber–Greene Company*, 26 F.3d 1573, 1582–83 (Fed.Cir.1994).

At the same time, the court held in abeyance the motion to compel production of the names of all FBI and/or DoJ personnel involved in the undercover operation "pending the outcome of agreed upon discovery between the parties." Order at 2. As indicated in the transcript of the oral argument held on October 20, 2000, the "agreed upon discovery" was that plaintiff would request some additional documentation from defendant and, depending on what that request produced, consider taking the deposition of Special Agent Matthews' superior, Supervisory Special Agent George Togliatti. Transcript at 22. The court suggested to government counsel that it might also make available for

---

15. Though MAOP (Part II, 6–5.2, Contractual Agreements) did provide that "[i]n necessary cases, the SAC may be authorized to execute the contract or other document committing funds and SAC's signature can be formally adopted by a contracting officer at FBI [Headquarters] following the transaction," there is no evidence or allegation of such "necessity" in this case or of any contract document signed by the SAC in Las Vegas that was adopted by a CO in Washington.

deposition the contracting officer who would have been responsible for approving any monetary promise to Perri. *Id.* at 28. (At oral argument counsel for the FBI confirmed that there would have been an identifiable contracting officer in FBI Headquarters with ultimate authority to approve or disapprove proposals emanating from the Las Vegas field office. *Id.* at 27–28.) The court also suggested to plaintiff's counsel that it could "take the depositions of everybody [in the FBI] with contracting authority to find out if they knew about [Matthews' alleged promise] and [if] they authorized it," *id.* at 17–18, though defendant's counsel hinted that the FBI might raise an objection to plaintiff deposing "people at headquarters." *Id.* at 23.

Pursuant to the court's order on "agreed upon discovery," plaintiff submitted a second set of interrogatories requesting that defendant furnish information and documentation pertaining to every meeting among Perri, FBI agents, and the targeted Mafia individuals at which Old Westbury Farm was discussed. Following defendant's objection, a second motion to compel, and another oral argument, the parties agreed and the court duly ordered in May 2001 that the interrogatories be restricted to two specific FBI agents. The Government proceeded to answer the interrogatories, as amended. In substance, defendant indicated that it had no information or documentation of any meetings among Perri, the FBI agents, and the Mafia individuals at which a compensation promise relating to the horse farm was discussed. Plaintiff evidently decided not to depose Special Agent Matthews' immediate superior, SSA George Togliatti. Nor did plaintiff request to take the deposition of any contracting officer at the FBI.

Instead, plaintiff submitted a third and a fourth set of interrogatories requesting the names of the FBI officials on the Undercover Review Committee which approved the sting operation. Defendant responded to plaintiff's interrogatories, but objected to the release of the subject information on the grounds that it would require the disclosure of matters covered by the deliberative process and law enforcement privileges. Plaintiff did not file a motion to compel the production of this information. At oral argument in July 2002, however, plaintiff's counsel repeated his request that defendant furnish the names of the Undercover Review Committee members, for the purpose of deposing them. Transcript at 33.

The court finds this information irrelevant to the issue of contract ratification in any event. The Undercover Review Committee was not a "contracting" body. The Committee could approve an undercover operation and its associated budget—from which discretionary payments could be made by SACs to informants and cooperative witnesses—but it could not approve a separate contract with any such individual to compensate him far in excess of the authorized budget. As specified in the FBI Field Office Manuals, only contracting officers at FBI Headquarters are authorized to execute agreements committing FBI funds to confidential investigations (with the exception of the limited unilateral payment authority accorded Special Agents in Charge—up to $5,000.00—for individual informants and cooperative witnesses). Accordingly, the alleged monetary promise by Special Agent Matthews—which plaintiff claims amounted to at least $1.4 million—had to be ratified by a contracting officer at FBI Headquarters to become a binding contract. The record does not indicate that any members of the Undercover Review Committee were contracting officers.[16] Accordingly, it is irrelevant whether they might have had "knowledge of" and "demonstrated acceptance" of a compensation promise by Special Agent Matthews to Anthony Perri—as required for contract ratification, *Harbert/Lummus, supra,* 142 F.3d at 1433–34—

---

**16.** Defendant submitted, for the court's *in camera* inspection, the minutes of the last four (of six) meetings held by the Undercover Review Committee in 1991–92 to consider the proposals (*i.e.,* the last three extensions and the amendment) for the undercover operation. No minutes were found for the meetings in 1990 that considered the original proposal and the first extension thereof. The minutes from the 1991 and 1992 meetings listed the committee members (and others) in attendance. The names of the attendees (whether committee members or not) varied considerably from meeting to meeting. None of the individuals, however, was an FBI contracting officer.

because they were not "empowered to bind the government." *Janowsky, supra,* 23 Cl. Ct. at 715–16 (note 10).

Furthermore, even if (hypothetically) one or more members of the Undercover Review Committee did know about a compensation promise by Special Agent Matthews relating to Old Westbury Farm and passed this knowledge along to a contracting officer, plaintiff would still have to prove the contracting officer's "demonstrated acceptance" thereof before a case for contract ratification could be made. At the oral argument held on plaintiff's first motion to compel in October 2000, the court suggested that plaintiff could depose all of the FBI's contracting officers to determine whether any of them knew of and authorized Matthews' alleged compensation promise to Perri, or at least depose the contracting officer who would have been directly responsible for authorizing a payment to Perri. But the plaintiff has not endeavored to depose any of those persons. Thus, even if there were evidence of a written or oral promise by Special Agent Matthews in regard to Old Westbury Farm, plaintiff has not taken the most obvious and elementary step to determine whether there is any basis for his claim that such a promise was ratified by an FBI official with authority to bind the agency in contract.

Moreover, the record is devoid of evidence that Matthews even made the promise plaintiff alleges. As previously discussed, the proposals relating to the undercover operation sent by the Las Vegas field office to FBI Headquarters do not mention any promise relating to Old Westbury Farm. Nor do the FBI's 137 File (Confidential Informant) and 270 File (Cooperative Witness) for Anthony Perri, Special Agent Matthews' internal memoranda, or the meeting minutes of the Undercover Review Committee contain any documentation of such a promise. Special Agents Matthews (in his May 1998 declaration and April 2000 deposition) and Byers (in his May 1998 declaration) denied that they made any promises to pay Perri a percentage of the proceeds generated by the farm, or other property, seized and forfeited as a result of the undercover operation. Perri himself did not claim that such a promise was made when he was specifically asked in his Memorandum of Understanding with the FBI, at the time he entered the Witness Security Program in September 1992, to identify "all promises and agreements" he had with "government agents and attorneys."

Thus, plaintiff has both (1) failed to submit evidence that an unauthorized promise was made and (2) failed to pursue his ratification theory with the only FBI official(s) who could turn an unauthorized promise into a binding contract. Lacking evidence of a contract on either end of the equation, plaintiff now seeks the names of a group of FBI personnel—the members of the Undercover Review Committee—who are not alleged to have made any promise(s) and do not possess contracting authority.[17] Obtaining the names of the committee members, in other words, would not bring the plaintiff any closer to establishing the existence of a contract. The court sees no point in plaintiff's effort and, in view of defendant's invocation of the law enforcement privilege, will not compel defendant to divulge those names. Plaintiff's motion to compel the production of the names of the Undercover Review Committee members is denied. The court deems discovery in this case to be closed.

■ In his supplemental memorandum of law, filed May 9, 2002, plaintiff argued that since defendant refused to provide the names of the Undercover Review Committee members it should be equitably estopped from denying either (1) the contracting authority of the agent who dealt with the plaintiff (Special Agent Matthews) or (2) the Government's ratification of the promises made by Matthews to the plaintiff. This court recently considered a similar equitable estoppel argument by an FBI informant in *Humlen v. United States,* 49 Fed.Cl. 497 (2001). As the court indicated in that case, the doctrine of

---

**17.** The court notes that to the extent that any member of the Undercover Review Committee may have been a contracting officer (strictly hypothetical, since there is no evidence thereof in the record), plaintiff's motion to compel is redundant because the names of all FBI contracting officers, in the time frame pertinent to this case, were already produced by defendant and have been in plaintiff's possession since January 2000.

equitable estoppel applies if (1) the Government knew the facts, (2) the Government intended that its conduct be acted on or acted so that the plaintiff had a right to believe that it was so intended, (3) the plaintiff was ignorant of the true facts, (4) the plaintiff relied on the Government's conduct and was injured thereby, and (5) the conduct or representations were made by government officials *acting within the scope of their authority*. 49 Fed.Cl. at 507. In rejecting plaintiff's argument the court explained that "none of the Special Agents who allegedly made the compensation promises had the requisite authority to do so, and therefore, plaintiff's claim for equitable estoppel must fail." *Id.*

■■■ Analogous reasoning applies in the case at bar. Special Agent Matthews clearly (under the FBI's internal rules) did not have contracting authority, either express or implied, to make any compensation promise to Perri. So any such promise he might have made to Perri would have been beyond the scope of his authority. Nor did members of the Undercover Review Committee have the authority to ratify any unauthorized promise by Matthews because none of them were FBI contracting officers. So any ratification action they might have taken would likewise have been beyond the scope of their authority. (As previously discussed, if any committee members *were* contracting officers, hypothetically, plaintiff does not need to have their names divulged anew since they are already in plaintiff's possession.) As in *Humlen,* therefore, plaintiff's equitable estoppel argument must fail.

### C. *Quantum Meruit*

■■■ Plaintiff argues that he is entitled to be compensated on the basis of *quantum meruit* (*i.e.,* for the value of the services he rendered) because "[i]t would violate . . . . good conscience to allow the government . . . . to benefit from the $5,600,000.00 forfeiture . . . . and not . . . . pay the plaintiff . . . . in an amount that is fairly merited under all of the circumstances." Pl. Opp. to Def. MSJ at 10–11. *Quantum meruit* is an equitable remedy for unjust enrichment which employs the fiction of a contract implied-in-law. As

explained by this court in *Mega Construction Company, Inc. v. United States,* 29 Fed.Cl. 396, 470 (1993), "[a] contract implied-in-law is one in which no actual agreement between the parties occurred but where equity imposes a duty in order to prevent injustice." (Citations omitted.) It is well established, however, that the Court of Federal Claims does not have jurisdiction over implied-in-law contracts. See *United States v. Mitchell,* 463 U.S. 206, 218, 103 S.Ct. 2961, 77 L.Ed.2d 580 (1983); *Wainwright Realty Co. v. United States,* 28 Fed.Cl. 425, 426 (1993); *AT & T v. United States,* 124 F.3d 1471, 1479 (Fed.Cir. 1997). Under the Tucker Act this court's contract-based jurisdiction "extends only to contracts either express or implied in fact, and not to claims on contracts implied in law." *Trauma Service Group v. United States,* 104 F.3d 1321, 1324 (Fed.Cir.1997) (quoting *Hercules, Inc. v. United States,* 516 U.S. 417, 423, 116 S.Ct. 981, 134 L.Ed.2d 47 (1996)).

Despite this legal precedent plaintiff contends that this court and its predecessor, the Court of Claims, have recognized the right to *quantum meruit* awards based on an "implied-in-fact" contract theory. See *Farmers Grain Co. v. United States,* 29 Fed.Cl. 684, 687 (1993); *United International Investigative Services v. United States,* 26 Cl.Ct. 892, 899 (1992); *Prestex, Inc. v. United States,* 162 Ct.Cl. 620, 320 F.2d 367, 373 (1963). Plaintiff cites language from *United States v. Amdahl,* 786 F.2d 387, 393 (Fed.Cir.1986), in which the Federal Circuit explained that:

[i]t would violate good conscience to impose upon the contractor all economic loss from having entered an illegal contract. Where a benefit has been conferred by the contractor on the government in the form of goods or services, which it accepted, a contractor may recover at least on a *quantum valebant* or *quantum meruit* basis for the value of the conforming goods or services received by the government prior to the rescission of the contract for invalidity. The contractor is not compensated under the contract, but rather under an implied-in-fact contract.

The Federal Circuit then quoted from the 1963 Court of Claims decision in *Prestex, Inc. v. United States*, 320 F.2d at 373:

> Even though a contract be unenforceable against the Government, because not properly advertised, not authorized, or for some other reason, it is only fair and just that the Government pay for goods delivered or services rendered and accepted under it. In certain limited fact situations, therefore, the courts will grant relief of a quasi-contractual nature when the Government elects to rescind an invalid contract..... "[T]he basic fact of legal significance charging the Government with liability in these situations is its retention of benefits in the form of goods and services."

786 F.2d at 393 (citations omitted).[18] In *United International Investigative Services*, which involved an initially valid contract that may have been illegally transferred in violation of the Anti–Assignment Act, 41 U.S.C. § 15, the Court of Federal Claims reasoned as follows:

> Assuming *arguendo* that the [the contract was illegally transferred], the voiding of th[e] contract did not automatically nullify the further dealings between plaintiff and defendant..... In this case, plaintiff and defendant, with the approval of the CO, fully carried out the contractual obligations embodied in the contract .... In similar circumstances, courts have found that an implied-in-fact contract for a *quantum meruit* arose.

26 Cl.Ct. at 899. Along the same line, plaintiff asserts that his work with the FBI, resulting *inter alia* in the forfeiture and sale of Old Westbury Farm, constitutes a fully performed (implied-in-fact) contract from which the Government derived substantial benefits, thereby entitling plaintiff to compensation on a *quantum meruit* basis.

The cases cited by plaintiff are factually distinguishable from the case at bar, however, because they involved *bona fide contract instruments* which became or were determined to be illegal or void at some point in the undertaking between the parties. There

was no question in each of those cases that the plaintiff and the Government had intended to enter into a contract and that the Government had received benefits as a result of the plaintiff's performance of the intended contracts. Here, Anthony Perri has failed to establish a similar mutuality of intent between himself and the FBI to enter into a contract whereby Perri would be paid a percentage of the proceeds resulting from the forfeiture and sale of Old Westbury Farm and other property forfeited to the Government in the sting operation. The record contains no evidence of any contract instrument or oral agreement, legal or illegal, authorized or unauthorized, giving credence to the existence of the compensation promise alleged by the plaintiff. Nor does the conduct of Anthony Perry and the FBI during the undercover operation, and the surrounding circumstances, demonstrate a tacit understanding with respect to the horse farm from which a "meeting of the minds"—and a contract implied in fact—can be inferred. See *United International Investigative Services*, 26 Cl.Ct. at 900. The benefits the Government received as a result of the FBI's relationship with Perri, including the forfeiture and sale of Old Westbury Farm, flowed from Perri's service as a confidential informant and cooperative witness—for which he was paid nearly $81,000.00—not from any mutual understanding, or contract implied-in-fact, concerning the horse farm. The case law discussed by plaintiff is inapposite, and his *quantum meruit* claim lacks any legal basis.

Plaintiff also cites, as additional grounds for his *quantum meruit* claim, the risks that he undertook in his role as an informant and cooperating witness. Plaintiff asserts that Special Agent Matthews had previously utilized Perri's services on other assignments, that Matthews recruited him to work on the undercover operation at issue in this action, and that he had to overcome Perri's initial reluctance to participate because of the danger involved. The record does not support plaintiff's version of the facts. The FBI's

---

18. *Amdahl* involved an appeal to the Federal Circuit of a decision issued by the GSA Board of Contract Appeals. Accordingly, it had nothing to do with the contract claim jurisdiction of the Court of Federal Claims (called the U.S. Claims Court at that time) under the Tucker Act.

internal memoranda that documented the "opening" of Anthony Perri as a confidential informant in January 1990 (the payment requests from Matthews to the SAC in Las Vegas) do not mention any previous relationship between Perri and Matthews (or anyone else in the FBI). The Government, in its proposed findings of fact that were uncontested by plaintiff, stated that Perri initiated contact with the FBI in December 1989 by offering to provide information about the illegal activities of certain Mafia individuals in the Las Vegas area. So the evidence indicates that Perri was the catalyst of the undercover operation, a willing participant therein, and was paid for his services by the FBI. In addition, Special Agent Matthews secured Perri a casino job at Caesar's Palace during his period as an informant, for which he was compensated above and beyond his regular payments from the FBI. Accordingly, the court finds no basis to conclude that plaintiff was coerced into working with the FBI or that he was unfairly compensated for the services he rendered.

The Government acted on Perri's legitimate concerns about his safety by placing him in the Witness Security Program when the criminal indictments were issued in 1992. But he voluntarily and unilaterally departed from that program a year later. The FBI offered to reinstate him at an estimated cost to the Government of $40,000.00. The offer was declined by Perri. Instead, in accordance with Perri's request, the FBI paid for his relocation. So the facts establish that Perri freely accepted the risks of participating in the undercover operation, was offered ongoing protection by the FBI when the operation came to a close, and reaped substantial financial benefits from his participation therein. Plaintiff's *quantum meruit* claim, seeking enormous additional compensation, is without merit.

### III.

The party moving for summary judgment may discharge its initial burden to produce evidence showing the absence of a genuine issue of material fact by demonstrating the absence of evidence to support the nonmoving party's case. See *Lockwood v. American Airlines, Inc.,* 107 F.3d 1565, 1569 (Fed.Cir. 1997); *Celotex Corp. v. Catrett,* 477 U.S. 317, 325, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). In opposing defendant's motion for summary judgment, plaintiff has the burden of providing sufficient evidence to show that a genuine issue of material fact exists. See *American Airlines, Inc. v. United States,* 204 F.3d 1103, 1108 (Fed.Cir.2000); *Armco, Inc. v. Cyclops Corp.,* 791 F.2d 147, 149 (Fed.Cir. 1986). To create a genuine issue of fact, plaintiff must do more than present some evidence on an issue it asserts is disputed. See *Roy, supra,* 38 Fed.Cl. at 187. "In countering a motion for summary judgment, more is required than mere assertions of counsel. The non-movant may not rest on its conclusory pleadings but .... must set out, usually in an affidavit by one with knowledge of specific facts, what specific evidence could be offered at trial." *Pure Gold, Inc. v. Syntex (U.S.A.), Inc.,* 739 F.2d 624, 626–27 (Fed. Cir.1984). See also *Singleton v. United States,* 6 Cl.Ct. 156, 168 (Cl.Ct.1984). The Federal Circuit recently confirmed this view in *Brubaker Amusement Co., et al. v. United States,* 304 F.3d 1349, 1361 (Fed.Cir.2002): "Summary judgment need not be denied merely to satisfy a litigant's speculative hope of finding some evidence that might tend to support a complaint." (Quoting *Pure Gold,* 739 F.2d at 627.)

The court finds that defendant has demonstrated the absence of evidence to support plaintiff's case by producing the FBI's 137 and 270 Files on Anthony Perri (documenting his service as a confidential informant and cooperating witness), neither of which includes any evidence of a promise by Special Agent Matthews or anybody else in the FBI to compensate Perri with a percentage of the sale proceeds of Old Westbury Farm or other property forfeited to the Government as a result of the sting operation. In addition, defendant has furnished declarations by Special Agents Matthews and Byers, plaintiff's two contact persons in the FBI, both of whom stated that they made no such promise to Perri. In his deposition testimony Matthews confirmed that the only compensation discussed in the proposal he sent to his superiors were the monthly payments of $2,375.00

for Perri's services and expenses during the undercover operation. The subject proposal is part of the record, along with the amendment and four six-month extensions. So too are the minutes of pertinent Undercover Review Committee meetings and Special Agent Matthews' internal memoranda concerning the undercover operation. All of this documentation corroborates Matthews' testimony. Plaintiff's MoU with the FBI from September 1992 further strengthens the Government's case since Perri did not mention the alleged promise in that document despite the specific direction to identify "all promises or agreements" made to him "by government agents or government attorneys."

Plaintiff has submitted little in the way of probative evidence to support his claim of a promise from the FBI relating to Old Westbury Farm. The affidavit he submitted to "clarify" the meaning of his 1992 MoU is unpersuasive in its attempt to explain why he neglected to mention Special Agent Matthews' alleged compensation promise at that time. The FBI letter of October 5, 1992, on which plaintiff places great weight, is not very helpful either. In the context of a letter written to expedite a modest $1,000.00 payment to Perri, the language plaintiff highlights ("No further payments are anticipated until the completion of all criminal and forfeiture proceedings.") cannot logically be interpreted as a promise to pay him an astronomically greater sum of $1.4 million or more in the near future. The court finds Special Agent Byers' explanation—*i.e.*, that the FBI, in its discretion, might make another modest payment to Perri as a final "thank you" for his services as a confidential informant and cooperative witness—much more convincing.

Plaintiff suggests that the Government is stonewalling his discovery efforts. The court does not agree. It is a well established presumption that public officials discharge their duties correctly, lawfully, and in good faith. See *Bateson v. United States*, 51 Fed. Cl. 557, 561 (2002); *Hoffman v. United States*, 894 F.2d 380, 385 (Fed.Cir.1990). To overcome the presumption of good faith dealing by government officials, there must be "well-nigh irrefragable proof" of the contrary. See *T & M Distributors, Inc. v. Unit-ed States*, 185 F.3d 1279, 1285 (Fed.Cir.1999); *Torncello v. United States*, 231 Ct.Cl. 20, 45, 681 F.2d 756 (1982); *Grover v. United States*, 200 Ct.Cl. 337, 344, 1973 WL 21332 (1973); *Knotts v. United States*, 128 Ct.Cl. 489, 492, 121 F.Supp. 630 (1954). While "well nigh irrefragable" has been the standard of proof generally recognized in the Federal Circuit, and the Court of Claims before it, in some cases a "clear evidence" standard has been used. See *Librach and Cutler v. United States*, 147 Ct.Cl. 605, 612, 1959 WL 7633 (1959); *George v. United States*, 166 Ct.Cl. 527, 531, 1964 WL 8601 (1964). In the case at bar plaintiff has provided no evidence whatsoever that any FBI or DoJ officials have failed to deal with him in good faith, or failed to correctly and lawfully discharge their duties, in responding to plaintiff's discovery requests.

In fact, plaintiff has obtained a wealth of pertinent documentation from the Government, including the names of all FBI contracting officers in the time period applicable to this claim. Moreover, with respect to certain redacted materials it provided the plaintiff, defendant has supplemented the record with unredacted versions that the court has reviewed *in camera*. None of the foregoing materials contains any evidence of a promise involving Old Westbury Farm. Plaintiff deposed Special Agent Matthews in April 2000, but the elicited testimony produced no evidence in support of Perri's contract claim. Despite having ample opportunity to do so, plaintiff has not elected to depose any additional FBI personnel, such as Matthews' immediate superior(s) or contracting officers who had the power to ratify an unauthorized promise by an agent. Instead, plaintiff has spent an inordinate amount of time and energy pursuing the names of the Undercover Review Committee members, which has the aroma of a fishing expedition. The court cannot fathom the usefulness of that exercise since (1) none of those individuals is alleged to have made the compensation promise to Perri and (2) none of them had the authority to ratify such a promise.

At oral argument (July 29, 2002) plaintiff's counsel stated that he had not deposed any contracting officers because, to his knowl-

edge, none of them had any connection to the undercover operation involving Anthony Perri. Transcript at 18. Plaintiff's counsel misses the point. The undercover operation—including the funds specifically budgeted by the Undercover Review Committee to pay Perri for his "services" and "expenses" as a confidential informant—did not need the approval of a contracting officer because it did not create any contractual relationship between Perri and the United States. However, a compensation promise by Special Agent Matthews on the scale plaintiff alleges—in the amount of $1.4 million or more—would most definitely have required the approval of a contracting officer. The only logical conclusion to draw from plaintiff's decision not to depose any FBI contracting officer(s) is that plaintiff himself doubted such deposition(s) would produce any evidence of a contract—*i.e.*, a ratification of Matthews' alleged promise.

As the case law makes clear, summary judgment should not be denied on the basis of unsupported assertions, speculative hopes, or conclusionary pleadings of the non-moving party that a genuine issue of material fact exists. See *Pure Gold, supra; Brubaker Amusement Co., supra.* Anthony Perri has provided no probative evidence that any compensation promise was made to him by Special Agent Matthews (or Special Agent Byers) in relation to Old Westbury Farm, or that any such promise was ratified by a contracting officer with the power to bind the FBI. In other words, the evidence of record overwhelmingly favors defendant and does not raise genuine, outcome determinative, factual issues which need to be explored at a trial. Accordingly, defendant's motion for summary judgment must prevail.

### CONCLUSION

In accordance with the foregoing discussion, the court hereby:

— DENIES plaintiff's motion to compel production of the names of the FBI Undercover Review Committee members, and deems discovery in this case closed;

— GRANTS defendant's motion for summary judgment. The clerk is ordered to enter JUDGMENT for defendant and DISMISS the complaint, as amended.

Each party shall bear its own costs.